## WILLIAM P. PRICE v. STATE.

No. 2053, Okla. T.    Opinion Filed November 19, 1908.

(98 Pac. 447.)

1.    APPEAL—Objections to Evidence—Definiteness. Objections to the admissibility of evidence must at least be as definite as is required by Act 1905 (Laws 1905, p. 327, c. 27, art. 7, sec. 2), or they will not be considered by this court.

2.    EVIDENCE—"Res Gestae"—Declarations. (a) Declarations, to be a part of the res gestae, need not be precisely coincident in point of time with the principal fact. If they spring out of it, shed light upon and tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberation and fabrication, then they are to be regarded as contemporaneous, and are admissible as evidence.

(b)    See facts in opinion that were properly admitted as part of the res gestae.

(c)    See opinion for reasons for admitting spontaneous exclamations as a part of the res gestae, and showing why they should not be treated as hearsay evidence.

3.    APPEAL—Review—Record of Excluded Evidence—Evidence—Admissibility—Homicide Threats. (a) Where an objection to a question is sustained, and it is desired to preserve the matter for review in this court, the facts expected to be proven by the witness, in answer to the question excluded, should be incorporated in the record, so that this court can determine as to whether material and legal evidence has been excluded.

(b)    When threats are relied upon as part of the ground for reasonable apprehension of danger, it is proper to admit any evidence which will tend to show the true character of the threats so made, and which tends to add weight to or detract from them.

4.    WITNESSES—Credibility—Evidence to Affect — Admissibility. It is error on cross-examination, for the purpose of affecting the credibility of a witness, to ask as to whom he married, for the purpose of showing that he had married a woman with whom he had committed adultery.

5.    HOMICIDE—Evidence—Admissibility—Giving Weight to Threats—Motive by Decedent. When there was evidence of threats to kill the defendant, and that deceased had fired the first shot in the fatal

difficulty, it was error to refuse to allow the defendant to prove that the deceased was under indictment for arson for burning a barn of the defendant, and that defendant was a witness against deceased on the charge of arson. This evidence was admissible, upon the ground that it tended to show motive on the part of deceased to kill defendant, and the further ground that it gave additional weight to the threats made, as ground of reasonable apprehension of danger, on the part of defendant.

6. EVIDENCE—Declarations of Conspirators—Furtherance of Common Design. Where there is the least degree. of acting together between two or more parties in the perpetration of an unlawful act, the threats or declarations of one, in furtherance of the common design, are admissible against all of his associates, although made in the absence of the others.

7. EVIDENCE—Conclusion of Defendant—Res Gestae—Statements of Defendant. (a) See opinion for statement of facts, under which the defendant should have been permitted to state what conclusion he arrived at with reference to the acts and intentions of the deceased and those acting with him.

(b) Statements made by a defendant, which constitute a part of the res gestae, are just as admissible in his favor as res gestae statements of the deceased are admissible against a defendant.

8. TRIAL—Instructions—Reasonable Doubt—Repetitions—Argumentative Instructions. (a) It is error to instruct a jury that the words "reasonable doubt" "mean a doubt for which the jury can give a reason."

(b) It is error, by constant repetitions, to give to even a correct instruction undue prominence in the minds of the jurors. Such instructions are, in effect, a charge on the credibility· of the witnesses and the weight of the evidence.

(c) It is error to instruct a jury as to the law in an argumentative manner.

9. HOMICIDE—Instructions—Self Defense—Construction as a Whole—Contradictory Instructions. (a) It is error to instruct the jury that "it must be apparent from the evidence that the circumstances and surroundings of the defendant, at the time of the homicide, were such as to cause in him a reasonable belief, founded upon reasonable evidence that he was in danger of death or great bodily harm at the hands of the deceased," before his right of self-defense would arise. The jury are not required to find him innocent, but must acquit, unless .his guilt is proven beyond all reasonable doubt.

(b) In a murder case, the jury should be affirmatively, clearly, and distinctively instructed that they must determine, from the defendant's standpoint, the question of his guilt or innocence, and as the facts. and circumstances in evidence reasonably appeared to him at the time of the homicide.

(c) Instructions to juries should be considered as a whole, and when so considered, and they harmonize with each other, and present the law of the case fully and fairly, they are sufficient.

(d)  Where there is a correct instruction upon a material question in a case, and in another portion of the instructions there is an incorrect statement of the law upon the same question, it cannot be said that the law has been clearly and fully given to the jury, and reversible error has been committed.

10    HOMICIDE—Negative Instructions—Threats. When threats, in connection with reasonable appearance of danger, are relied upon, the court should clearly and affirmatively instruct the jury as to the bearing of threats upon reasonable appearances of danger. A negative instruction upon this matter is insufficient.
(Syllabus by the Court.)

*Appeal from Roger Mills County; C. F. Irwin, Judge.*

William P. Price was convicted of manslaughter in the second degree and appealed. Reversed and remanded.

On the 5th day of May, 1904, the grand jury of Roger Mills county returned an indictment against Wm. P. Price (hereafter called defendant), in which defendant was charged with the murder of James Yandell, on the 18th day September, 1903. On the 18th day of September, 1906, the trial began, and on the 22nd of September the jury returned a verdict of guilty of manslaughter in the second degree against the defendant. Motions for a new trial and in arrest of judgment were filed, and overruled. The court, on the verdict of the jury, sentenced the defendant to four years' confinement in the penitentiary at Lansing, Kan. The defendant then brought this case by appeal to the Supreme Court of Oklahoma Territory. Upon the admission of Oklahoma into the Union, under the provisions of the enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267) and the Constitution of the state (Const. Schedule, § 27; Bunn's Ed. § 476) this case was transferred to the Supreme Court of the state. Upon the creation of the Criminal Court of Appeals, as directed by law, this case was transferred by the Supreme Court to this court.

*S. B. Garrett, A. R. Garrett, J. W. Johnson, D. B. Welty* and *John B. Harrison,* for appellant.—

On the question of erroneous instruction on right of self-defense: Vol. 5 pp. 33, 34 and notes, A.& E. Ency. of Law; *People v. Elliott,* (Cal.) 22 Pac. 207; *Phillips v. State,* 26 Tex. App. 228;

*State v. Patterson,* 45 Vt. 308; *State v. Donahoe,* 78 Iowa, 486; *Mahaffey v. Territory,* 11 Okla. 213; *Kirk v. Territory,* 10 Okla. 46, 60 Pac. 797; *State v. Hatch,* 57 Kan. 420, 46 Pac. 708; *People v. Hecker,* 109 Cal. 451; *State v. Reed,* 53 Kan. 767, 37 Pac. 174; *State v. Howard,* 14 Kan. 175; Vol. 25 A. & E. Ency. Law, 259.

On question of statements of deceased being admissible as *res gestae*: *People v. Wong,* (Cal.) 30 Pac. 1115; Underhill on Criminal Evidence, sec. 94, p. 118 *et seq.*; *Mayes v. State,* 64 Miss. 329; 60 Am. Rep. 58.

*W. O. Cromwell, J. H. Cline,* and *W. C. Reeves,* Assistant Attorney General, for the state.—

On the question of admissibility of deceased's statements as *res gestae*: *Johnson v. State* ( ) 58 Pac. 761-763; *Lewis v. State,* 15 S. W. 642 (Tex.); *State v. Hudspeth,* 60 S. W. 136 (Mo.); *Davids v. People,* 61 N. E. 537 (Ill..).

On the question of proper cross-examination to discredit witness: *United States v. Wood,* 4 Dak. 455; *State v. Raven,* 115 Mo. 419. *Helm v. Commonwealth,* 81 S. W. 270.

FURMAN, PRESIDING JUDGE. (after stating the facts as above). We will consider the assignment of errors in the order in which the matters complained of arise during the trial, and will state only so much of the testimony as is necessary to a proper understanding of the legal questions involved. As this case will be remanded for a new trial, we do not deem it necessary to state the evidence in full.

First. Defendant complains of the action of the trial court in overruling an objection made by his counsel to a question propounded by the prosecution, in its direct examination of the witness A. D. Jones. This witness had testified at some length to the facts leading up to the fatal difficulty. It appears among other things, that the witness and the defendant had gone into a saloon, at the request of the witness, to get some beer; that a man named Parks and James Yandell, the deceased, came into the saloon, also, and went up to the counter. It was in evidence that bad

blood existed between these parties and the defendant, and that threats had been made by Parks and the deceased against defendant. Parks stepped up to the bar, and took some change out of his pocket, and slammed it down on the counter pretty hard, and said: "By God, give us something to drink!" Defendant was standing at the bar with witness. In the language of the witness:

"Mr. Price [defendant] shrunk back and away, and then is when I noticed Walter Price [a son of defendant]. He stepped between Mr. Price and the bar. He told his father he was there, and he would—what he meant was that he would attend to any trouble that might come up, and for him to keep out of trouble. * * * The first thing I knew a gun went off, and Walter Price reeled against me, and said he was shot."

The witness was then asked this question:

"Walter's remark was addressed to his father wasn't it? A. Yes, sir. Q. and in substance was telling him not to get into any trouble, and if there was any trouble coming up, he (Walter) was there to attend to it? (By Mr. Garrett: Objected to. By the court: Overruled. Exceptions.) A. Yes, sir."

This is an exact copy of the record touching this matter.

Section 2 of an act relating to practice and procedure in the district courts (Sess. Laws Okla. T. 1905, p. 327 c. 27, art. 7) is as follows:

"Sec. 2. That section 332, article 16, chapter 66 being general section 5430, Wilson's Revised and Annotated Statutes of Oklahoma, 1903, be and the same is hereby amended to read as follows: 'Section 332. An oral examination is an examination in the presence of the jury or tribunal which is to decide the facts or act upon it. The testimony being heard by the jury or tribunal from the lips of the witness . Where any party desires to object to any question put to the witness, either before a court or tribunal or upon the taking of depositions upon notice, the ordinary objections of incompetency, irrelevancy or immateriality, shall be deemed to cover all matters ordinarily embraced within such objection and it shall not be necessary to specify further the grounds of such objections or to state the specific reasons whereby the question becomes so objectional, but the court or opposing counsel may inquire of the objector wherein the question is so objectionable and the objector shall thereupon state spec-

ifically his reasons or grounds for such objections.' "

Whatever this court may think upon this subject, we are bound by the statute above quoted. It wi'l be seen that the counsel for defendant simply said: "Objected to." This does not comply with the statute, and therefore does not amount to any objection. The better, and the safer practice is to point out the specific objection relied upon. But the objection must at least go as far as the statute provides; otherwise it cannot be considered by this court. We are not willing to relax the rules relating to objections to evidence any further than the statutes require us to do. So we will not consider this matter, holding that no legal objection was made.

Second. Defendant complains of the action of the trial court in admitting, over his objection, the evidence of Charles Boren. The record touching this matter is as follows: The witness testified that he was in the store of the witness, in the town of Sayre, when the shooting occurred; that within a minute or three-quarters of a minute thereafter, witness went into a back room of the saloon, where the shooting had occurred, and found the deceased. The record then proceeds:

"Q. Did he know you? A. Yes, sir. Q. What was his position? A. He was lying with his shoulders against the north end of the house, and his hip was against the screen door. He was laying on his right side. Q. Was the screen door shut? A. Yes, sir. Q. Did you talk to him any? A. Yes; I talked to him some. Q. I wish that you would detail the conversation; what you said, and what he said. (Objected to, as no foundation was laid for statement in the nature of a declaration. By the Court: Overruled. It is a part of the *res gestae.* Half minute. Defendant excepts.) A. I think I remarked, 'What is the matter with you, Hood?' [The evidence showed that the deceased was sometimes called Hood.] And he said, 'I think I am killed,' and I said, 'I guess not; I hope not'—and he said 'I wish you would send for my folks,' and I said, 'all right,' and then he said to me, 'Say, Charley, do you know what the old man shot me for?' and I said, No; I don't. Was you having any trouble with him?' And he said, No, but the other boys were.' "

As the evidence was admitted solely upon the ground that it was part of the *res gestae,* it is not necessary to discuss the law

of dying declarations. We therefore withhold any expression of opinion upon that question. The defendant insists that the evidence was not *res gestae* because the statement of the deceased was not made until after the defendant had left the place of the difficulty, and after the deceased had had a conversation with Frank Brewer. The record shows that, immediately after tne shooting, the witness Brewer went into the room where the deceased was, and the conversation was held as follows:

"Q. Did you speak to Mr. Yandell when you went back there? A. Yes, sir. Q. What, if anything, was said by him? A. I asked him if he was bad hurt. I don't remember what reply he made, but he could not get up, and I helped him over so he could sit up against the wall, and I noticed that blood was running out of him, and I saw that he was hurt."

As to what constitutes *res gestae* is possibly the most complex and difficult question in criminal law. As far as our investigation has gone, no appellate court has attempted to give a definition of *res gestae* which was intended to cover the entire question. At best courts can only deal with it in the light of the facts of each particular case in which it arises. The result is that great conflict exists in the opinions of the courts as to what evidence is admissable as a part of the *res gestae*. The more the question is investigated, the more apparent it becomes that it is impossible to harmonize and reconcile these conflicting opinions with each other. Any such attempt would be certain to end in defeat and in despair. The best that this court can do is to give the general principles, which we believe to be founded upon justice and supported by reason, which are applicable to the facts of the individual case before us. Our concern is to get as near as possible at the truth and foundation principles of the matter. It is our duty to give to Oklahoma, as far as we can, a just and harmonious system of criminal jurisprudence, which will aid in the administration of justice, and thereby assist trial courts in the discovery of the truth and the enforcement of law. It is our purpose to decide all legal questions in the light of reason and the moral atmosphere which surrounds them. It will not be denied that,

where an act is done which is material to be understood, whatever may be said at the time, and which explains the purpose with which the act is done is a part of the thing then being done. Therefore to admit such statements in evidence is not in violation of the rule forbidding the introduction of hearsay evidence. Such statements are original evidence, and are classed as verbal acts. There is no substantial conflict in the authorities upon this question.

The conflict begins when it is attempted to introduce statements which are not identical, in point of time, with the act which they are claimed to explain. The authorities all agree that the statements, to be admissable, must be contemporaneous with the act done, and well calculated to unfold the nature and quality of the main fact in issue, and so to harmonize with it as obviously to constitute one transaction. The rock upon which the courts divide is as to the meaning of the word "contemporaneous." Many authorities limit the meaning of this word to identity of time and place, while the great majority go further and extend it to statements which grow out of, and are directly connected with, the act, although they precede or follow it. Action, without thought, is imbecility of mind, and cannot therefore be either meritorious or criminal. It is true that men often act upon impulse, but this impulse is the result of previous thought which has caused a mental condition. There must be a Union of both action and intention to constitute a felony. Any amount of action without intention is not felonious, and any amount of intention without action is also not felonious. Both of these elements are indispensible in cases of felonies. One and the same act may be either criminal or praisworthy, according to the intention with which it is done. By way of illustration: Suppose that at midnight A., with an incendiary purpose, applies a torch to the house of B., in the city, and destroys it by fire. He is a criminal of the blackest hue. Suppose that a great conflagration is raging in the city, and A., being in charge of the fire department of the city, at the same hour applies a torch to the house of B., and destroys it by fire (which is often done), for the purpose of

burning ahead of the fire and thus checking the force of the conflagration; his act is legal, and free from blame. So, in the trial of a criminal case, it is the intention which gives character to the act and makes it either justifiable or a violation of the law. Now we cannot look into the minds and hearts of men and see what their intentions are. We can only determine their intentions by considering all of the facts which are connected with the matter under investigation, whether they precede, occur at the identical time, or follow the main fact, and which shed light upon the main act done. These facts constitute the *res gestae*. So what is said by the participants in a difficulty, with reference to the actions of either party, if contemporaneous with the acts done, and which grow out of and throw light upon what is done, is admissible in evidence as a part of the *res gestae,* and goes to the jury for what it is worth. The court simply passes upon the admissibility of the evidence. The jury are the judges as to its weight and credibility.

We approve what was said upon this subject by the Supreme Court of California in the *Vernon Case,* 35 Cal. 50, 95 Am. Dec. 49, which is as follows:

"It appears from the evidence, as presented in the record, that a witness, Dainty, resided about 200 feet from the residence of the prisoner. That deceased called at witness' house on Friday evening, the 21st of December, between 10 and 11 o'clock, and requested him to go with deceased to the house of prisoner for the purpose of amicably arranging a recent difficulty between prisoner and deceased. Dainty told deceased to wait till he put on his clothes, and he would go along, to which deceased replied that he would go along and see prisoner if he was up, and if he was in bed, he would call him up, and witness could come along. Witness dressed himself and started, had passed about half the length of his porch when he heard a shot, continued to advance towards prisoner's house, and immediately heard three more shots in quick succession, and when he got about half-way to prisoner's house met deceased walking fast from the direction of prisoner's house. That it was about half a minute and not exceeding three-quarters of a minute from the time witness heard the first shot till he met deceased, who immediately said he had been shot treacherously by defendant. That he

(deceased) was sitting down on defendant's porch. That defendant came out to the door and spoke to him, and said, 'Wait till I go and put my boots on,' and instead of going to put his boots on, he came out with a gun and shot him when he was sitting on the porch. That when he (deceased) got up to go away, defendant followed after and shot him in the back. The objection to these declarations of deceased being given in evidence is urged upon the ground that they were not made at the very time of the shooting, but after the shooting had been concluded. That these declarations were made under such circumstances, and in such connection with the main fact, as to allow them to be given in evidence as part of the *res gestae* we have no doubt, and no error was committed in admitting them as such. Declarations, to be a part of the *res gestae,* are not required to be precisely concurrent in point of time with the principle fact. If they spring out of the principle transaction, if they tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberate design, then they are to be regarded as contemporaneous, and are admissible. I Greenl. Ev. § 108; *Mitchum v. State of Georgia,* II Ga. 615; *Commonwealth v. McPike,* 3 Cush. (Mass.) 181, 50 Am. Dec. 727."

We also approve the language used by the Supreme Court of Alabama in *Gandy v. Humphries,* 35 Ala. 624, which is as follows:

"It is extremly difficult, if not impossible, to settle by exact definition what declarations are to be considered as forming parts of the *res gestae.* It has been said, in general terms, that the idea of the *res gestae* presupposes main fact, and includes only such circumstances, facts, and declarations as grow out of the principle transaction, are contemporaneous with it, and serve to illustrate its character. *Lund v. Tyngsborough,* 9 Cush. (Mass.) 36; *Carter v. Buchannon,* 3 Ga. 517; I Greenl. Ev. § 108. The imperfection of this definition has, however, been frequently admitted; and, as is the case with most legal generalities, many difficulties have been found in its application to the various cases which have arisen in practice. When it is said that declarations, to be admissible as parts of the *res gestae,* must be contemporaneous with the principle transaction, it is not meant that they shall be exactly coincident in point of time with the main fact. If they appear to spring out of the transaction—if they serve to elucidate it, and are made so shortly after the happening

of the main fact as to stand in the relation of unpremeditated result to it, the idea of deliberate design in making them being fairly precluded by the surrounding circumstances—then they may be regarded as contemporaneous. *Mitchum v. State,* 11 Ga. 615; *Commonwealth v. McPike,* 3 Cush. (Mass.) 181, 50 Am. Dec. 727; *Handy v. Johnson,* 5 Md. 450; *Hart v. Powell,* 18 Ga. 639; *Land v. Tyngsborough,* 9 Cush. (Mass.) 36; *Carter v. Buchanon,* 3 Ga. 517; *Rawson v. Haigh,* 2 Bing. 99; *Traun v. Keiffer,* 31 Ala. 137; 1 Greenl. Ev. § 108, and notes. The declaration of the plaintiff, the admission of which was one of the matters excepted to on the trial, answers all of these conditions and we think there was no error in permitting it to go to the jury."

To our minds the best discussion of *res gestae* which we have found in the books is contained in *Mitchum's Case,* 11 Ga. 621 As this is a question of great importance, and difficulty, and as it may arise in the trial of any case, we will copy and adopt this part of the opinion. It is as follows:

"The rejection of the sayings of the prisoner, as proven by Thomas Gilbert, we think was an error, and upon this and one other ground to be noticed in its order, we are constrained to award a new trial. A well ascertained rule of evidence is that a party cannot be permitted to manufacture evidence for himself. A consequence flowing out of this rule is that the sayings of a party in his own behalf cannot be proven. There are exceptions to the inadmissibility of such sayings, and however well founded in reason and justice the rule may be, the exceptions are vindicated by both reason and justice. It is, however, right to guard the rule with severe vigilance, and to admit the exceptions with great caution. Without such a rule it would be competent for every criminal to provide for his acquittal with a very moderat amount of forecast and self-possession, and go 'unwhipped of justice,' whilst at the same time, without the exceptions, in some cases, innocence would meet the felon's fate. For example a man of untarnished life and character is found on the highway with an instrument of death in his hand, reeking with blood, but freshly drawn from the heart of one who is expiring at his feet. With no witness to the transaction, such a man is convicted by the circumstances, and would, by the operation of the general rules of the law, die as a murderer. In the moment of discovery, however, he is heard to exclaim, 'I slew him in defense of my life.' The admission of these sayings would save the life of an

innocent man, whilst their exclusion would consign him to the gallows. The case supposed is an extreme one, and is given for illustration, and not for the purpose of testing the correctness of the ruling is this case. In the language of this court, in *Monroe v. State;* 'If we unconditionally refuse to allow a defendant under any circumstances, to have his conduct interpreted by his acts and speech, we shall frequently deliver over the accused a helpless and hopeless sufferer to the penalty of the law.' 5 Ga. 132. Whenever the sayings constitute a part of the *res gestae,* they are within the exception, and are admissible. We consider that the excluded sayings of the prisoner in this case were a part of the *res gestae.* What, then, is meant by *res gestae?* I cannot more satisfactorily answer this question than by transcribing what I said on a former occasion. 'The idea of the *res gestae* presupposes a main fact. With this preliminary remark, I answer that the *res gestae* mean the circumstances, facts, and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character. I do not claim that this definition is perfect, for I know that the *res gestae* are different in different cases. No definition could be found so comprehensive as to embrace all cases. Hence it is left to the sound discretion of the courts what they shall admit to the jury along with the main fact, as parts of the *res gestae.* But perhaps this definition embraces as nearly all that is meant in legal parlance by that phrase as any other that can be drawn from the books. One peculiarity of the main fact or transaction ought to be noted, and that is that it is not necessarily limited as to time—it may be a length of time in the action. The time of course depends upon the character of the transaction. It is, however, well settled that the acts of the party, or the facts or circumstances or declarations which are sought to be admitted in evidence, are not admissible, unless they grow out of the principal transaction, illustrate its character, and are contemporary with it.' Again I say: 'Declarations as parts of the *res gestae,* made at the time of the transaction, are regarded as verbal acts, indicating a present purpose and intention, and are therefore admitted in proof like any other material facts. An indispensable characteristic of declarations is that they must be made at the time of the act done, which they are supposed to characterize; and, further, they must be calculated to unfold the nature and quality of the facts they are intended to explain, and so to harmonize with them as obviously to constitute one transaction.' *Carter v. Buchannon,* 3 Ga. 517, 518. As applicable to this case, I refer also to the prop-

osition stated by Judge Lumpkin, in his opinion in *Monroe v. State*. It is this: When an act is done to which it is necessary to ascribe a motive, it is always considered that what is said at the time, from which the motive may be collected, is a part of the *res gestae.'* .*Monroe v. State*, 5 Ga. 85. In determining questions about the *res gestae*, it is an error to undertake to test them by a definition or rule. For what is the *res gestae* of a given transaction must depend upon its own peculiarities of character and circumstances. Courts must be allowed some latitude in this matter. *Rawson v. Haigh*, 2 Bing. 104; *Ridley v. Cyde*, 9 Bing 349, 352; *Poole v. Bridges*, 4 Pick. (Mass.) 379; *Allen v. Duncan*, 11 Pick. (Mass.) 309.

"Adjudicated cases, determined by able courts, are safe guides; and when not to be found, like that which is before us, we are left to apply to .it the principles which the rule embraces, irrespective of the rule itself. In applying these, let us inquire what is required to bring a declaration within the exception of the *res gestae*. They must grow out of the main fact. They must serve to illustrate it, and they must be made contemporaneously with it. When these things are true of declarations, they are provable, not as the testimony of the declarant, but as partaking. of the nature of facts. They derive their credibility, not from his veracity, but from their relation to the transaction out of which they spring. Made at the same time with the main fact, evoked by it without premeditation, and for that reason explanatory .of the mind and purpose of the actor as it is involved in that fact, they are presumed to be as veritable, as reliable, as the fact itself, and would derive no enhancement of their credibility from the oath of the declarant. .Such I take to be the philosophy of the *res gestae*, so far as constituted of declarations. The weight which they are to receive at the hands of the jury will depend upon the closeness and fullness of their relation to the transaction out of which they spring, their proximity in point of time to- it, and the strength of the light which they shed upon it. The motive with which an act is done is frequently the point of inquiry to which the attention of courts is directed. To ascertain that, contemporaneous declarations are admissible, 'where a person (says Prof. Greenleaf) does any act material to be understood, his declarations made at the time of the transaction, and expressive of its character, motive, or object, are regarded as verbal acts, indicating a present purpose and intention, and are therefore admitted in proof like any other material facts.' Greenleaf's Ev. § 108. With these principles in view, we come to the im-

mediate question made in this record. · The transaction or main fact here is the killing—it is the mind or motive with which the prisoner was actuated when he slew the deceased that was to be ascertained. The great inquiry in this case (as in all cases of murder) was whether the killing was with malice, express or implied. Now if the declarations of the prisoner grew out of the killing, and were, according to the construction of the rule which I shall give, contemporaneous with it, and tend to disprove malice, then they illustrate or explain the fact of the killing, and are admissible. Adverting to the declarations, it seems that the witness was within 30 or 40 yards of the house when the deceased was shot. Upon hearing the report of the pistol, witness ˙ooked towards the house and saw a person that he took to be the prisoner run out, who ran a few paces, and turned and ran again into the house, and immediately ran out again, and ran to where witness was standing. He ran slow and awkward, which induced witness to suppose he was very drunk. When he came to witness, he seemed greatly agitated and troubled, and at the moment of his coming up to him, he exclaimed 'that he would not have done it for the world.' Gilbert further testified that 'I minute would probably cover the time from the firing until the prisoner uttered the exclamation; 2 certainly would.' For a full understanding of the point I have detailed the testimony of Gilbert with a little more minuteness than it is found in the reporter's brief. The most important matter to be considered is the time that elapsed between the killing and the utterance of the rejected exclamation. That was from I to 2 minutes, 'Probably,' says Mr. Gilbert, 'I—certainly not more than 2.' Take the medium time between I and 2, and it is I½. The agitation of the prisoner is to be noticed; also the fact that no one was in pursuit of him. No attempt had been made at the time that he spoke to the witness to arrest him. No one present at that moment had spoken to him. His coming to where witness was seems to have been voluntary, and the exclamation spontaneous. The meaning of the exclamation is also important. The natural interpretation of it seems to me to be the expression of profound regret or remorse; such as a man would feel after unintentionally killing a fellow creature. Upon the hypothesis that the killing was not a deliberate murder, but the result of a reckless, drunken bravado use of a hair-trigger, self-cocking revolver (and the defense seems to have been put chiefly on this ground), this interpretation is a fair and natural interpretation. It is true that such an exclama-

tion, made after the fact, might be the deliberate and studied fabrication of guilt made with a view to acquittal.    I must believe, however, that the circumstances do not warrant this construction, and that the former interpretation is most reasonable.    The short period of time that had intervened and the agitated manner of the prisoner forbid the idea of deliberate design.    He can scarcely be supposed, within 90 seconds from the fall of his victim, to have deliberated with himself upon the expediency of such declaration. He cannot be necessarily believed to have in fact so deliberated, because his running out of the house immediately after the firing, and then back again, and then out again, and his distressed and agitated appearance when he reached the witness exhibit a state of mind incompatible with such a belief.    Nor do I believe that such an exclamation would readily or naturally escape from a man who had but just satisfied the demands of a murderous malice.    Such a man, at such a moment, would most naturally, in his heart, exult in the very fiendishness of the act.    Remorse would not, in the very moment of gratified vindictiveness, be the feeling of such a one, and, not feeling, he would not be likely to express it.    Such being the most probable meaning of the declaration, does it not spring out of the act?    It seems to me that it is its legitimate fruit, and bears as necessary a relation to it as an immediate effect bears to a cause.    Not only so, but it serves to illustrate it.    It sheds light upon the question of malice—upon the motive, or which is the same thing, the want of motive, under which the prisoner acted; that is to say, it serves to explain the killing, by showing that it was not his intention to kill, and thus rebuts the implication of malice.    To what extent it will go, if to any, when considered in connection with all the testimony in the case, is for the jury to determine.    My purpose in all that I have said is to bring these declarations within the rule of the *res gestae.*    I mean to express no opinion as to the guilt or innocence of the prisoner.

"The requirement of the rule further is that the declarations be contemporaneous with the transaction.    Now, where the books say—when this court has said—that the declarations must be contemporaneous with the act, or when they or this court say that the declarations must be made at the time of the act, it is not to be understood that we or the books assert that declarations are never to be admitted unless their utterance is exactly coincident in point of time with the act.    Declarations, in the legal sense of the word, may be contemporaneous with the act, when they pre-

cede or follow the act; and when they are to be admitted. and when rejected, if not coincident with the act is a question for judicial discretion, of embarrassing nicety—one which must depend upon the application of the principle upon which the rule is founded, and which I have endeavored to state, to the circumstances of each case. If the declarations appear to spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and if they are made at a time so near to it as reasonably to preclude the idea of deliberate design, then are they to be regarded as contemporaneous? Amplification cannot make the view which I have of this point plainer, and I shall therefore leave it here, referring to a few authorities to sustain the position that, to be contemporaneous, declarations are not always required to be exactly concurrent with the act. In *Rawson et al. v. Haigh et al.,* Park, J., says: 'It is impossible to tie down to time the rule as to the declarations. We must judge from all the circumstances of the case. We need not go the length of saying that a declaration made a month after the fact would itself be admissible. · But if, as in the present case, there are connecting circumstances, it may, even at that time, form a part of the whole *res gestae.'* 2 Bing. 99. See, also, *Tompkins v. Saltmarsh,* 14 Serg. & R. (Pa.) 275; *Poole v. Bridges,* 4 Pick. (Mass.) 378; 21 Howell's St. Tr. 542; 1 Starke R. 353; *Thorndike v. City of Boston,* 1 Metc. (Mass.) 247; 9 Bing. R. 349; *Reynold's Case,* 1 Ga. 230; *Monroe v. State,* 5 Ga. 85. In this case the intervening time being only one minute and a half, and all the circumstances precluding the idea of deliberation, we are satisfied that proof of the declarations ought to have been admitted."

We might cite other cases almost without limit to the same effect, but the reasoning in the cases above quoted from is so clear and just that we do not deem it necessary to do so. We will only cite Wharton on Criminal Evidence, § 236. He there says that statements of the deceased at the time of the killing, or so soon before or afterwards as to preclude the hypothesis of concoction or premeditation, charging the defendant with the act, are admissible as part of the *res gestae.*

There is another view supporting the admission of this class of evidence, which presents itself to our minds with great force, and that is that the same rules of law which admit dying de-

clarations are applicable to spontaneous declarations. Both class-
es of evidence rest upon the same grounds, viz., necessity and
sincerity. The rule of necessity is purely arbitrary. It is recog-
nized solely upon the ground that, if dying declarations were
excluded, cases would often arise where it would be impossible
to convict persons guilty of murder. But before dying dec-
larations are admissible, the necessity of the case must be safe-
guarded by some guaranty of the sincerity of the witness. This
is found, in the presumption that, where a person has given up
all hope of recovery, and realizes that he is soon to stand in the
presence of his Maker and Judge, all worldly motives will be lost,
and that the awful conditions which surround the party are at
least equal to the sanctity and binding force of an oath or af-
firmation administered in a court of justice. These same rules
apply with equal force to spontaneous declarations. In fact the
safeguard of sincerity is greater in cases of spontaneous de-
clarations than in cases of dying declarations. Experience teach-
es us that men do not always speak the truth in the presence of
certain death. There may be, and often is, premeditation in con-
nection with a dying declaration. This opens the way to fabri-
cation. Such things are much more difficult, if not impossible,
as to contemporaneous spontaneous declarations. Here there is
no time for deliberation and fabrication; and experience shows
that, where one speaks impulsively, under such conditions, there
is almost a certainty that the truth will be told. It is the facts
talking through the witness.

We do not desire to be understood as expressing any opin-
ion as to the guilt or innocence of the defendant. That is a ques-
tion with which at this time, we have nothing to do. We are
simply discussing the question of the admissibility of the evidence.
Its weight and credibility upon another trial, will be for the jury
without reference to anything that may be said in this opinion.
In this case the deceased was still suffering from the excite-
ment of the difficulty and the shock of the wound. It is highly
improbable that his mind was in a condition to deliberate and

manufacture a statement. His statements were spontaneous declarations, depending for credence, not upon the veracity of the deceased, but upon their close connection with the immediate facts of the killing and the circumstances which negative the idea of premeditation or fabrication. While his words were "after talk," it cannot be said that they expressed "after thought." The connection between what he said and the main fact had never been broken. His statements were therefore contemporaneous with the acts of the killing, although not identical in time and in place. The fact that the witness Boren had, a few seconds before, spoken to deceased, and had placed him in a more comfortable position, does not indicate that the live wire which connected the mind of deceased with the shooting had been broken or in any manner been interfered with. None of the authorities hold, so far as we have found, that the defendant must have heard the exclamations made in order to constitute them a part of the *res gestae*. Therefore it was immaterial that the defendant had left the place of the difficulty before the exclamations were made. We are therefore of the opinion that the court did not err in admitting the evidence complained of as part of the *res gestae*.

Third. Defendant complains of the action of the trial court in sustaining objections to questions propounded to his witnesses, but the record does not show, except inferentially, the facts which defendant expected to prove by the witnesses, if they had been permitted to answer the questions to which objections were sustained. In the absence of such showing in the record this court cannot review the rulings of the trial court or hold that material error was committed in the rejection of competent testimony. In order to avoid mistakes, the jury should have been withdrawn, and the court should have heard the testimony. Then the record should have shown what the rejected evidence was. This court would then have been in a position to pass intelligently upon the question. As this record stands, we cannot say that the court committed material error in the ruling complained of. But as this case will be remanded for a new trial, upon other questions, we will suggest that, if it is offered to be shown, upon a

second trial, that the deceased, or those acting with him, had made threats against the defendant, and that these threats had been communicated to defendant, and had been partially executed by the deceased, or those acting with him, such facts should be admitted in evidence, as the partial execution of threats according to their terms gives increased weight to the parts remaining unexecuted, and would tend to intensify the apprehensions of defendant on account of such threats, and the more readily to cause him to believe that at the time of the homicide it was the purpose of the deceased, or those acting with him, to carry out the rest of the threats, and take his life. We make this suggestion because we learn from the brief of counsel for defendant that this is the character of evidence which they desired to get before the jury in reply to the questions to which objections were sustained. If this had appeared in the record, we would have held that it was error to reject the testimony offered.

When threats are relied upon, it is permissible for the state to introduce any evidence in its power to show that they were of such character, or came from such a source, as not to be the basis of a well-grounded apprehension of danger in the mind of the defendant. Thus in *Sims v. State,* 38 Tex. Cr. R. 642, 44 S. W. 524, it is said:

"The first bill of exceptions raises the question as to the admissibility of the character of deceased as being a peaceable and inoffensive man. It is shown by the bill that said testimony was admitted after defendant had introduced evidence of threats made by the deceased against him. We think the action of the court in this respect was proper."

Upon the other hand, it is equally true that in such cases the defendant has the right to lay before the jury any fact or facts which would tend to add weight to the threats so made, and thus intensify his apprehensions therefor. In *Russell's Case,* 11 Tex. App. 291, Judge Hurt said:

"Bearing upon the question as to whether the grounds for fearing death or serious bodily harm were reasonable, defendant had the right to lay before the jury all circumstances which go to show the character of the threats, the intention with which

they were made, and the grounds of fear on which the defendant acted."

Fourth.  Defendant complains of the action of the trial court in permitting counsel for the prosecution, on cross-examination, to ask a witness of defendant whom he had married, for the purpose of showing that the witness had married a woman with whom he had committed adultery.  This evidence was admitted by the trial court upon the ground that it tended to affect the credibility of the witness.  It is the opinion of this court that error was committed in overruling defendant's objections to this evidence.

This question came before the Supreme Court of Oklahoma Territory in the case of *Flohr v. Territory*, 14 Okla. 439, 78 Pac. 572, and in rendering the unanimous opinion of the court, Judge Gillette said:

"Upon the cross-examination of Mrs. Luella Richards, for the purpose of affecting her credibility a question was propounded to her with reference to her marriage to Dr. Richards; and when the complaining witness, C. H. Richards, was on the stand, like questions were propounded to him on cross-examination, which, if answered affirmatively, would show that Mr. and Mrs. Richards, up to the date named, had lived in adulterous relation to each other, and that during that time Dr. Richards was not divorced from his former wife, who resided in the state of Illinois. It was also sought to discredit Dr. Richards' testimony by showing upon cross-examination that in the practice of his profession he had been guilty of producing an abortion in two certain instances.  All of this testimony was by the court excluded and the exclusion of it is complained of in this case.  The defendants testified to certain understandings and agreements had with Dr. Richards and his wife, and with reference thereto there was a material conflict in the testimony.  This cross-examination touching character was here tendered for the purpose of affecting the credibility of the witnesses.  The questions propounded did not tend to question their reputation for truthfulness.  They went to the general moral character, and tended to hold them up to public contempt, ridicule, and disgrace, while at the same time their general character for truthfulness may have been unimpeached, and the territory was entitled to their testimony before the jury, uninfluenced by matters irrelevant to the cause, and

which do not seem to have been made the subject of legal investigation by indictment or otherwise, and as the questions propounded were entirely disconnected with the subject under investigation, and did not tend to impeach their reputation or character as truthful persons, we think the court committed no material error in excluding this evidence."

Fifth. The defendant complains that the action of the trial court in refusing to permit defendant to prove that the deceased and Jim Parks were under indictment at the time of the homicide, charged with arson, for burning the barn of defendant. It appears that the defendant was a witness against the parties for this alleged offense. There was error in the rejection of this evidence. The fact that these parties were indicted for burning the barn of defendant would not even tend to prove that they, or either of them, did burn the barn in question, but it would tend to prove that these parties had a motive for getting defendant out of the way, so that he could not testify against them; and whether the charge of arson was true or false, the pendency of the indictment would tend to increase the apprehensions of defendant on account of the threats, claimed to have been communicated to him as having been made by deceased and Parks before and after the date of the alleged burning of his barn. The rejected testimony should have been admitted upon these two grounds. It will not be disputed that any circumstance which would tend to prove a motive, on the part of the defendant, to kill deceased would have been admissible in evidence against him. In this case, when the plea of self-defense was interposed, and there was testimony that the deceased fired the first shot, the motive of the deceased and Parks became just as material as was the motive of the defendant, and any evidence tending to show the motive of either of them should have been admitted.

Sixth. Defendant complains of the action of the court in refusing to allow proof of threats made against him by Jim Parks when the deceased was not present. This evidence was offered on the theory that Parks and deceased were acting together. The trial court held that there was no evidence in the record of

such acting together, and that therefore threats made by Parks, not in the presence and hearing of deceased, were not admissible. We do not desire to be understood as expressing any opinion as to the weight of the evidence or the credibility of the witnesses, but we cannot agree with the trial court in saying that there is no testimony in this record tending to show that these parties were acting together in this matter. As to what credence the jury should give to this evidence is not for this court to say. It is enough for us to know that there is some evidence in the record to this effect. In 2 Wharton on Evidence, § 1205, we find the following:

"When a conspiracy is shown to exist, which is usually inductively from circumstances, then the declarations of one conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. *The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all.*" (See, also, *Phillips v. State*, 6 Tex. App. 380: *Hannon v. State*, 5 Tex. App. 549).

Seventh. The defendant complains that the court erred in not permitting him to state what impression the conduct and language of deceased and Jim Parks made upon defendant. The defendant had just testified that the deceased and Jim Parks had entered the saloon where defendant was; that they both drank, either whiskey or beer; that deceased and Parks then held a low conversation, which defendant did not understand; that defendant had turned to leave the saloon, and that deceased and Jim Parks moved up, and came around immediately in front of defendant; that Parks hummed and danced a jig; that deceased came up behind Parks, and looked in the face of defendant and said, "I am the best God damn man in Sayre"; that deceased looked at defendant in a vicious manner; that deceased and Parks were then two or three feet in front of defendant. The defendant was then asked: "What conclusion did you arrive at, at that time with reference to these parties and their intentions?" On objection being made, the defendant was not permitted to answer the question. In the light of the entire evidence in this case—of threats

claimed to have been made against defendant by deceased and Parks, and of previous alleged troubles between them—we think that it was error to refuse to allow the defendant to state what conclusion he arrived at from their conduct. The very question which was then under consideration was as to the state of mind of the defendant. The jury would not have been bound by the answer of the defendant as to his state of mind or purpose. But it should have gone to the jury for their consideration, in the light of all the other facts and circumstances in evidence before them. We are also of the opinion that the statements, made by the defendant to his sons Herbert and Walter at the time, about getting the team and leaving should have been admitted as a part of the *res gestae* of that transaction, for statements made by a defendant which are a part of the *res gestae* are as much admissible in his favor as statements made by the deceased are admissible against a defendant upon the ground of *res gestae*. The law has no favorites, and makes no arbitrary distinctions between parties. The prosecution had fully presented its side of this portion of the difficulty, which resulted in the death of deceased. Every circumstance and word unfavorable to the defendant had been clearly brought out. Common justice and fairness required that the defendant should have been permitted to present his side of the matter with equal latitude. That which is unfair and unjust will not be permitted by this court to be enforced as law in Oklahoma, unless clearly commanded by the statutes of the state.

Eighth. Defendant complains of action of the trial court in charging the jury as follows:

"The term 'reasonable doubt,' as used in these instructions, means a doubt which has some good reason for it, arising out of the evidence in the cause; such a doubt as you are able to find in the evidence, or lack of evidence, a reason for."

This very question has been passed upon by the Supreme Court of Oklahoma in the case of *Abbott v. Territory*, 20 Okla. 119, 94 Pac. 179. It was there held by Chief Justice Williams, with all the Justices concurring, that it was reversible error to

charge a jury that "by the term 'reasonable doubt' is meant a
doubt you can give a reason for." We concur in the reasoning
of Chief Justice Williams, and the conclusion reached in the
*Abbott Case,* and it will be followed by this court. In addition
to the authorities cited and discussed in *Abbott's Case,* we call
attention to *Wallace's Case,* 9 Tex. App. 300. It is there said:

"The legal presumption of innocence is not removed, or the
jury entitled to convict, until the guilt of the accused is established
by the evidence, not to the exclusion of a reasonable belief to
the contrary, but beyond a reasonable doubt."

The vice in the instruction of which the defendant com-
plains is that it requires the jury to convict unless they find in
the evidence a doubt for which they can give a reason. This
shifts the burden of proof, and reverses the humane principle
of our law, which requires the jury to acquit unless they can say
that the defendant is guilty beyond a reasonable doubt. The in-
struction forces a conviction unless the jury are able to find a
doubt for which they can give a reason, while the law requires
an acquittal unless the jury can say there is no reasonable doubt.

In *Blocker's Case,* 9 Tex. App. 279, the court said:

"It is not essential to an acquittal that the jury should en-
tertain a reasonable belief, or any other kind of belief, that the
defendant is not guilty, but the law presumes that he is not guilty
until his guilt is established by competent evidence to the satis-
faction of the jury, beyond a reasonable doubt, * * * and
it might often happen that a jury is required, under the law and
the evidence, to return a verdict of acquittal when each member of
the jury might reasonably believe that the defendant was not
innocent."

In *Smith's Case,* 9 Tex. App. 150, the court said:

"And when a jury are unable to say upon their oaths, from
the evidence, that the defendant upon trial is proven guilty be-
yond a reasonable doubt, the law requires them to return a verdict
of acquittal, whether they believe him guilty or not."

We do not mean that this language should be given in an in-
struction to the jury. We make these suggestions as a matter
of argument, to show the error in the instruction given. The
words "reasonable doubt" in our statute are used in their ordinary

sense in common acceptance among the people.    An instruction in the language of the statute is sufficient, and is by far the safest course to pursue.    Any effort to elucidate the meaning of the words "reasonable doubt" is dangerous, as will be found from an examination of the decided cases.    In *Bramlette's Case,* 21 Tex. App. 619, 2 S. W. 766 (57 Am. Rep. 622), the court said:

"The charge of the court was substantially, if not literally, in the language of the statute.    This is not only all that the court is required to do, but is exactly what it should do in charging the reasonable doubt."

We commend this practice to the trial courts of the state. By adhering to it the needless reversal of many cases will be avoided.    There are two other objections to the instruction on reasonable doubt, as given in this case, to which we desire to call attention.    These instructions cover three typewritten pages. Taken as an entirety, the instructions are cumulative and argumentative.    It is error for a trial court, by constant repetition and reiteration, to give undue prominence to even a correct statement of the law.    It unduly impresses the propositions so repeated, and fixes them on the minds of the jurors as the controlling propositions in the case.    In *Irvine's Case,* 20 Tex. App. 41, the court said:

"We will not discuss *seriatim* the objections made to the charge of the court.    It occurs to us that in more than one respect it is obnoxious to the criticisms made by appellant's counsel, and the objections urged to it.    In *Traylor v. Townsend,* 61 Tex. 144, the court says:    'It is undoubtedly improper for a court to place by frequent repetitions, too prominently before a jury any principle of law involved in the case'—citing *Powell v. Messer,* 18 Tex. 401.    And especially is such rule important in a criminal case, in order to guard against creating an impression upon the minds of the jury as to what may be the opinion of the court with regard to the facts to which the principle is applicable. *Horan v. State,* 7 Tex. App. 183; *Owen v. State, Id. 332, Smith v. State, Id.* 383."

The trial court cannot charge directly upon the weight of the evidence.    Why, then, should it be permitted to convey to the minds of the jurors what the court thinks about the case by

these constant repetitions? No one can read the instructions given in this case upon the subject of reasonable doubt without being impressed with the idea that in the opinion of the trial court there was no such doubt in this case, and that it was the opinion of the trial judge that the jury should convict this defendant. While the trial judge doubtless did not intend to produce this result, yet we are dealing with consequences, and not with intentions, and we feel it our duty to admonish trial courts in Oklahoma to avoid such instructions in the future. We know that it is often impossible to give all of the law applicable to one branch of a case in a single paragraph or an instruction; but, where it is necessary to refer to the same proposition of law more than once in instructions, care should be taken to do so in such language as will not give it undue prominence. Instructions should simply state the law applicable to the evidence. Arguments should be made only by the counsel in the case. Thompson in Trials (volume 2, § 2301) says:

"The judge should hold the scales of justice evenly, and not assume the character of an advocate. Argumentative instructions trench upon the province of the jury, and therefore should not be given."

Ninth. Defendant contends that the trial court erred in giving the following instruction:

"The jury are instructed that, where the evidence shows beyond a reasonable doubt that the homicide was committed by the defendant, and the defendant seeks to avoid the responsibility for the killing on the grounds of self-defense, it *must be apparent from the evidence* that the circumstances and surroundings of the defendant at the time of the homicide were such as to cause in him the reasonable belief, founded on reasonable evidence, that he was in imminent danger of death or great bodily harm at the hands of the deceased, *and, before the defendant can be excused, he must have used all reasonable means within his power consistent with his safety to have avoided the danger which apparently threatened him, and to have averted the necessity for the killing.* If by the exercise of any reasonable means within his power consistent with his safety the defendant could have avoided the surroundings as they existed at the time of the homicide, and thus

averted the necessity for the killing, it was his duty to have done so, *and unless he did use all means consistent with his safety to have averted the necessity for the killing, he cannot be excused on the grounds of self-defense."*

The effect of this instruction was to inform the jury that they must affirmatively find two facts before they could acquit the defendant: First, that it must appear from the evidence, or in other words, that the jury "must find from the evidence, that the circumstances and surroundings of the defendant at the time of the homicide were such as to cause in him the reasonable belief, founded on reasonable evidence, that he was in imminent danger of death or great bodily harm at the hands of the deceased." Second, that the jury must find, as an affirmative fact, that the defendant had used all means consistent with his safety to have averted the necessity of the killing, and that, unless they found these facts from the evidence, the defndant would not be excusable, and that the jury should convict defendant. We do not so understand the law. This instruction is utterly inconsistent with, and directly contradictory to, the fundamental principle of criminal law that all persons charged with crime are presumed to be innocent until they are proven to be guilty, by competent evidence, beyond a reasonable doubt, and that the burden is not upon a defendant to prove his innocence, but is at all times upon the state to prove his guilt beyond a reasonable doubt. Neither is it the law that when a person is threatened with death or great bodily injury he must use all means consistent with his safety to avert the necessity of killing his assailant before he will be justified in doing so. This instruction destroyed the right of the defendant to act upon appearances of danger. It took from defendant the right to have the jury view the facts and circumstances of the case from the defendant's standpoint. It required that the defendant should have tried to run away before he could have exercised the right of self-defense. If this instruction is correct, then the right of self-defense can only be exercised by cowards and slaves, and as to brave men and free men it is a mockery, a snare, and a delusion. How different

the just and humane rule recognized and laid down by Judge Burford in *Kirk v. Territory,* 10 Okla. 76, 60 Pac. 806, as follows:

"A man may repel force by force in the defense of his person, habitation, or property, against any one, or many, who manifestly intend and endeavor, by violence or surprise, to commit a known felony on either. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and if in the conflict between them he happen to kill him, such killing is justifiable. 2 Wharton on Crim. Law (7th Rev. Ed. Phila. 1874) § 1019. See, also, *Gallagher v. State,* 3 Minn. 270 273 (Gil. 185, 188) ; *Pond v. People,* 8 Mich. 150, 177 ; *State v. Dixon,* 75 N. C. 275, 295 ; *State v. Sherman,* 16 R. I. 631, 18 Atl. 1040 ; *Fields v. State,* 134 Ind. 46, 32 N. E. 780 ; *Eversole v. Commonwealth,* 95 Ky. 623, 26 S. W. 816 ; *Haynes v. State,* 17 Ga. 465, 483 ; *Long v. State,* 52 Miss. 23, 35 ; *Tweedy v. State,* 5 Iowa, 433 ; *Baker v. Commonwealth,* 93 Ky. 302, 19 S. W. 975 ; *Tingle v. Commonwealth,* (Ky.) 11 S. W. 812 ; 3 Rice's Ev. § 360."

In *Mahaffey v. Territory of Oklahoma,* 11 Okla. 231, 66 Pac. 348, Judge Hainer correctly said:

"It is always incumbent upon the prosecution to establish each and every material element of the crime charged in the indictment by competent evidence, beyond a reasonable doubt, before the jury is warranted in finding the defendant guilty of the crime charged in the indictment, or any lesser offense therein contained. The vice of the instruction is that it requires the defendant to establish by the evidence, beyond a reasonable doubt, that he had wholly retreated to a place of apparent security before his right of self-defense was fully restored. We think the correct rule is this: That every person has the right to act in his own necessary self-defense : and, where a person is in a place where he has a right to be, and is not the aggressor in bringing on the conflict, and is assaulted by another person in such a way as to place him in danger of death or great bodily harm, the person thus assaulted is not bound to retreat, but, on the contrary, may stand his ground and repel the danger in which he is placed with such force as will repel the attack and protect his person from serious bodily harm, and, when it is necessary to protect himself from deadly assault, or from receiving great bodily harm, even to take the life of his assailant. And such person will not be held re-

sponsible criminally if he acts in self-defense, from real and honest convictions as to the character of the danger, induced by reasonable evidence, although he may be mistaken as to the extent of the actual danger. *Kirk v. Territory,* 10 Okla. 46, 60 Pac. 797; *Beard v. United States,* 158 U. S. 550, 15 Sup. Ct. 962, 39 L. Ed. 1086; *Steinmeyer v. People,* 95 Ill. 383; *Roach v. People,* 77 Ill. 25; *Crews v. People,* 120 Ill. 317, 11 N. E. 404; *State v. Fraunberg,* 40 Iowa, 555; *State v. Bohan,* 19 Kan. 28; *Murry v. Commonwealth,* 79 Pa. 311."

In *Allison v. United States,* 160 U. S. 203, 16 Sup. Ct. 252, 40 L. Ed. 395, Chief Justice Fuller, in rendering the unanimous decision of the court, in speaking of what it takes to constitute an overt act on the part of the deceased to justify a defendant upon the charge of murder, said:

"What is or is not an overt demonstration of violence varies with the circumstances. Under some circumstances a slight movement may justify instant action because of reasonable apprehension of danger, under other circumstances this would not be so. And it is for the jury, and not for the judge passing upon the weight and effect of the evidence, to determine how this may be. In this case it was essential to the defense that the jury should be clearly and distinctly advised as to the bearing of the threats and the appearance of danger, at the moment, from defendant's standpoint, and particularly so as it did not appear that the deceased then had a pistol upon him, though there was evidence that it was his habit to carry one, and that he had had one immediately before."

In *Jordan's Case,* 11 Tex. App. 449, the court said:

"Again, in the paragraph quoted from the charge the jury were further told: 'If you believe he [defendant] did know he was in no such danger, or could have known it by reasonable care exercised, then such killing would not be justifiable.' A party who has reasonable expectation or fear of death or serious bodily harm, imminent and pressing under the circumstances as they appear to him, is not required to wait until he has by the exercise of reason carefully examined all the facts necessary to be known as to the truth and correctness of his apprehensions. To require this would be to render entirely nugatory and worthless the kind and humane provision of the law which allows him to act, and act promptly, even to the taking of his assailant's life, when it reasonably appears by the acts, or by the words coupled with the

acts, of the person killed that it was the purpose and intent of such person to take his life or to do him some serious bodily harm. When a man has a reasonable expectation or fear of death or of some serious bodily harm from an unlawful attack made upon him, he may kill, and kill upon the very spur of the moment; and the law will justify the homicide, without requiring him to show that by the exercise of additional care the killing could not have been avoided with safety to himself."

We desire to emphasize the idea that, in a trial for murder, the jury should be clearly and distinctly instructed that the facts in evidence must be viewed from the defendant's standpoint, and as they reasonably appeared to him at the time of the homicide, in the light of all the evidence in the case. There is just ground of complaint against the instruction given, because it says: "If by the exercise of any reasonable means within his power, consistent with his safety, the defendant could have avoided the surroundings as they existed at the time of the homicide, and thus averted the necessity for the killing, it was his duty to have done so." This made the guilt of the defendant rest upon the surroundings as they existed in fact, and not the surroundings as they appeared to the defendant, taking into consideration all of the facts and circumstances of the case in evidence, and as defendant, as a reasonable man, then had the right to consider them. In support of the conclusion which we have reached, in addition to the authorities above quoted, we will cite the case of *State v. Reed,* 53 Kan. 778, 37 Pac. 179 (42 Am. St. Rep. 322). This court says:

"Another complaint is with reference to an instruction given upon the subject of self-defense, in which the court told the jury that, if one is unlawfully attacked by another, he may stand his ground and use such force as reasonably appears necessary to repel the attack and protect himself. The criticism is that the instruction given leaves the jury to infer that the appearances were to be judged by them, and not by the defendant. 'A party assailed is justified in acting upon the facts as they appear to him, and is not to be judged by the facts as they are.' *State v. Howard,* 14 Kan. 175."

The cases quoted from express our views so clearly and fully that we are relieved from the necessity of making an elaborate

argument upon this matter. But it is contended, upon behalf of the state, that any errors which may have been committed in the instruction complained of were cured by the following instruction given to the jury:

"You are instructed, as a matter of law, that if a person believes, and from his standpoint has a reasonable cause to believe, that another has sought him out for the purpose of killing him, or of doing him great bodily harm, and that he is prepared therefor with deadly weapons, and he makes demonstrations such as to cause such person to believe that he is to be attacked, then the person so threatened is not required to retreat, but he has the right to stand and defend himself, and to pursue his adversary, if necessary, until he has secured himself from danger; and, if in so doing it is necessary, as viewed from his standpoint, in the light of all the evidence, or reasonably appears to be necessary, to kill his adversary, the killing is excusable on the ground of self-defense, and this is true notwithstanding it may afterwards appear that such apprehended danger was not real, but only apparent. A person need not be in actual imminent peril of his life or of great bodily harm before he may slay his assailant. It is sufficient if, in good faith, he has a reasonable belief, from the circumstances as they appear to him at the time, that he is in such imminent peril."

This instruction is not itself above criticism, and we do not desire to indorse it as a model, but conceding, for the sake of the argument, that it is an absolutely correct statement of the law, does it necessarily cure the errors pointed out in the instruction complained of? We concede the contention of the state that instructions are to be construed as a whole, and if, when so construed, they clearly and correctly state the law, then the instructions are sufficient. But this does not mean that an erroneous instruction upon a material issue can be cured by giving a correct instruction upon the same question in another portion of the instructions. Can instructions which are self-contradictory be harmonious and sufficient? Who can tell which instruction was followed by the jury? If the court did not harmonize the instructions given, how can it be expected that the jury could

or would do so? If juries are to pass upon the sufficiency of instructions, then are they not the judges of the law as well as the facts? Instructions should be clear, explicit, and free from ambiguities and contradictions; otherwise they may confuse and mislead the jury. The Supreme Court of Colorado, in *Clare v. People,* 9 Colo. 125, 10 Pac. 801, said:

"Where the charge in a criminal case contains in part an important correct legal proposition, and in another an incorrect and conflicting proposition, and upon the same subject, the subject referred to being material to conviction, it cannot be said that the error is avoided; for it is impossible to know upon which proposition the jury relied. To prevent reversal for error in the charge, it must appear that the prisoner could not have been prejudiced thereby. *Mackey v. People,* 2 Colo. 13; *People v. Campbell,* 30 Cal. 312; *Caw v. People,* 3 Neb. 369; *Greene v. White,* 37 N. Y. 407, and cases cited."

In the case of *State v. Hartzell,* 58 Iowa, 520, 12 N. W. 557, the Supreme Court said:

"The instruction is clearly erroneous because the defendant would have been justified in using a deadly weapon, if he had reasonable grounds to believe that he alone would receive great bodily harm if he did not do so. The Attorney General does not claim otherwise, but he insists that there are other instructions in which the rule is stated differently. It is true that in the thirty-first, and perhaps other instructions, it is said, if either the defendant or his brother were in danger of receiving great bodily harm, then the defendant was justified in using a deadly weapon. One great difficulty in the case is the instructions are too voluminous, and therefore tend to confuse. But the best that can be said is two rules have been laid down for the guidance of the jury, and they may have adopted the erroneous instead of the correct rule. The instructions are contradictory, and therefore liable to confuse."

While there are a few cases in the reports which hold otherwise, yet we have not found a single well-considered case which fails to hold that, where the instructions given are contradictory upon a material question, it is ground for reversal. We will adopt this rule, because it is reasonable and just, and well supported by the overwhelming weight of the authorities.

Tenth.   The defendant complains of the refusal of the trial court to give the following special instruction, requested by the defendant:

"You are instructed that, if you find from the evidence that the deceased, Yandell and the deceased Jim Parks, prior to the time at which they lost their lives, had made threats against the defendant, and had threatened to do him bodily injury or take his life, and if you further believe that at the time  of  the difficulty in which they lost their lives they were acting in concert, in an attempt to assault and injure him or take his life, then the defendant was justified in defending himself, even to the taking of the lives of the said deceased, and he will not be held responsible, if afterwards it should appear that he was mistaken in his belief, if from the evidence taken all together it appears from such threats and the acts of the said deceased at such time that he had reasonable cause to believe, and in good faith did believe, that it was their purpose, at such time, to do him great bodily injury or take his life."

We do not altogether approve the form of this requested instruction, but it was sufficient to call the attention of the court to the matter, and the court should either have given the instruction requested, or should have given a proper instruction on the subject of threats.   The court charged the jury as follows on this question:

"Previous threats, made by the deceased against the defendant, whether communicated to the defendant or not, and any previous injuries done by the deceased to the accused, if any such are shown by the evidence, will not justify the defendant in taking the life of the deceased, unless at the time of the homicide the deceased was making some demonstration, or doing some act, which would raise in the mind of the defendant the reasonable belief that the deceased designed and intended, at the time of the homicide, to carry such threats into immediate execution, and unless from all the facts and circumstances surrounding the homicide the defendant honestly believed that he was in danger of death or great bodily harm at the hands of the deceased, and that such belief was based upon reasonable evidence, the homicide cannot be excused on the grounds of self-defense.   And if the jury believe from the evidence beyond a reasonable doubt that at the time of the homicide the deceasd was not making any

demonstration or doing any act which would induce a reasonable belief in the mind of the defendant that he was about to do him some great bodily harm, and that the act of the defendant in taking the life of the deceased was not necessary, or apparently necessary, in the reasonable and necessary defense of himself or his son against great bodily harm, which threatened, or apparently threatened, him by the deceased, then the plea of self-defense cannot avail, and the jury should find the defendant guilty."

It will be seen that, so far as the rights of the defendant are concerned, this instruction on threats is negative in form. It tells the jury of all the conditions under which the defendant would not be justifiable, but it nowhere tells the jury in a clear and affirmative manner, the conditions under which the defendant would be justifiable in acting upon the appearances of danger in connection with threats. Both sides of the question should have been fully and fairly presented to the jury. The charge given by the court, as far as it goes, is proper, but it should have gone further, and presented the affirmative side of the question, and informed the jury that, if the deceased, Yandell, or the deceased and Jim Parks had threatened to inflict serious injury upon or to kill the defendant, and if these threats had been communicated to the defendant before the time of the homicide, and if at the time of the homicide the deceased or the deceased and Jim Parks, by some act then done, manifested a purpose to carry, at that time, such threats into execution, and if from the threats so communicated to the defendant, and from all of the words and acts of the deceased, Yandell, or the deceased and Jim Parks at that time, it then reasonably appeared to the defendant from his standpoint, and he did in good faith honestly believe that the deceased, Yandell, or deceased, Yandell, and Jim Parks had then done some act indicating a manifest purpose upon their part to then carry such threats into execution, then and in that event, the defendant would have had the right to defend himself even to the extent of taking the lives of deceased, Yandell, and of Jim Parks, and that in so doing the

law would hold him guiltless, even though it might afterwards appear that he was mistaken, provided only that he acted in good faith and upon such reasonable appearances of danger, and that if the jury so found, or if they entertained a reasonable doubt upon this issue, they should acquit the defendant. It was error to present the negative side of the question, and neglect and refuse to present the affirmative side, as above indicated.

In this case there was no necessity for an instruction upon the law of uncommunicated threats.

For the errors hereinbefore pointed out, the judgment against the defendant is reversed, and the cause is remanded.

BAKER and DOYLE, Judges, concur.