## R. C. MOREHEAD v. STATE.

No. A-2501.   Opinion Filed October 14, 1915.

(151 Pac. 1183.)

1. **CONTINUANCE—Appeal—Discretionary Ruling.** An application for a continuance is addressed to the sound discretion of the trial court, and a ruling of the trial court denying a continuance will not be disturbed by the appellate court, unless an abuse of this discretion is clearly shown, but where such an abuse is manifest, especially in a capital case, it is the duty of the appellate court to interfere, in the furtherance of justice.

2. **JURY—Disqualification of Juror—Fixed Opinion.** A juror who on his voir dire testified that he had heard detailed what purported to be all the facts by a person who claimed to know all about the case of his own knowledge, and that he had a fixed opinion as to the guilt or innocence of the defendant that it would take strong evidence to remove, is clearly incompetent to sit as a juror and on a challenge for cause should be rejected, even though on further examination he stated that he could and would, notwithstanding such opinion, act impartially and fairly, and render an impartial verdict upon the law and the evidence, and where the defendant exhausts his peremptory challenges, and such juror is retained on the panel, the overruling of the challenge is ground for reversal.

3. **HOMICIDE—Dying Declarations—Admissibility.** Dying declarations, to be admissible, must be made under ·a sense of impending death; but it is not necessary that the declarant state that he is expecting immediate death. It is enough if, from all the circumstances, it satisfactorily appears that such was the condition of his mind at the time of the declarations.

4. **HOMICIDE—Dying Declarations—Admissibility.** On a trial for murder the dying declarations of the deceased are not limited as evidence in favor of the state alone, but are equally admissible in favor of the defendant.

5. **HOMICIDE—Dying Declarations—Evidence.** It is the province of the court to determine, in the first instance, the admissibility of declarations offered in evidence as dying declarations, and for the purpose of proving the declarant's sense of impending death, expressions or statements of the deceased are always admissible, if made at or about the time the dying declarations were made; and in this case it was the duty of the court to hear the evidence offered by the defendant, before determining that the dying declarations were incompetent and inadmissible.

6.     **EVIDENCE—Declarations of Deceased—Res Gestae.** On a trial for murder, declarations of the deceased made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterances of thought created by or springing out of the homicidal act, and made so soon thereafter as to exclude the presumption that they are the result of premeditation and design, and without knowledge of which the principal fact might not be properly understood, are admissible as part of the res gestae.

7.     **HOMICIDE—Argument of Counsel—Prejudicial Error.** On the trial of a negro charged with the murder of a white man, before a jury of white men, the county attorney in his opening argument referred to the defendant as ''This black murderer.'' On objection being made the court admonished counsel to be temperate in his remarks. The county attorney in his closing argument referred to the defendant as ''This coal black murderer.'' Again, objection being made, the court peremptorily overruled the same. The language objected to, held to be grossly improper, and prejudicial to the defendant; and the refusal of the court to interfere and to properly instruct the jury to disregard the same, prejudicial error.

(Syllabus by the Court.)

*Appeal from District Court, Kiowa County;*
*Thomas A. Edwards, Judge.*

R. C. Morehead was convicted of murder and appeals. Reversed.

*L. M. Keyes,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. Plaintiff in error, R. C. Morehead, herein referred to as the defendant, was informed against for the murder of one Clifford Garrison. The trial jury found him guilty of said charge and fixed his punishment at death. His motion for a new trial having been overruled and sentence of death having been pronounced upon him, the judgment has been brought to this court for review.

The evidence shows or tends to show the following facts: Previous to February 1, 1915, the defendant had been employed in the press room of the oil mill at Snyder. Clifford Garrison, the deceased was the bookkeeper at the oil mill. On Sunday,

February 7th, about one o'clock p. m., the defendant shot Clifford Garrison. From the effects of the wound he died the following Sunday. The shooting occurred in front of the shack occupied by the negro employees of the oil mill.

It appears that the defendant had been discharged for writing some vulgar words on the wall, which he refused to rub out, and that the defendant had some disagreement with the deceased about his pay, and that he said to one of the employees: "I have just been to the office and settled with the boys at the office and got my check and I am going to shoot them office boys off at the pockets."

On the day of the shooting it appears that there was a row among the negroes at the oil company's shack, and Clifford Garrison with his brother-in-law, Paul Hadley went from the oil mill to the shack to see what the trouble was. On reaching the place Garrison told the defendant that he had been discharged and had better go back up town before he started some trouble. The defendant said, "I do what I please and say what I please and go when I please," and started towards him, and Garrison said, "Don't come towards me," and picked up an iron bed rail and the defendant grabbed the rail and took it from Garrison, saying: "Go back to the office and take care of your own damn business," and then pulled a pistol and shot Garrison. There was a conflict in the evidence which it is not necessary to speak of in detail. It is enough to say that the defendant testified that the deceased began the quarrel and struck him over the head with the iron rail and he shot him in his necessary self-defense.

The errors assigned will be noticed in the order presented:

The first contention is that the trial court abused its discretion in denying the application for a continuance. The shooting took place the 7th day of February, 1915. On the 20th day of February following, the information was filed in the District Court. On the third day of May, the defendant was duly arraigned and entered a plea of "not guilty" and the case was set for the 8th day of May. On that day the case was called for trial and the

state announced "ready," and the defendant presented his motion and affidavit for a continuance. The affidavit is in part as follows:

"That since the said seventh day of February, 1915, affiant has been confined in the county jail at Hobart, Oklahoma, and a part of the time at the reformatory at Granite, in said state.

"That affiant is a negro and the said Clifford Garrison was a white man and very popular in the community where the difficulty occurred, wherein the said Clifford Garrison was shot and wounded, whilst affiant is a laboring man, wholly without financial means and practically unknown in said community, save to a few negroes who were laborers there like himself.

"That affiant cannot safely proceed to the trial of the above cause at this time because of the absence of witnesses, whose testimony is material to his defense in said cause, and who are absent at this time without his procurement and against his wishes.

"That the following named persons were eye witnesses of and were present at the time and place of the occurrences and difficulty between affiant and the said Clifford Garrison and the shooting which resulted in the death of said Clifford Garrison, to-wit: P. W. Perkins, Oscar Wilson and Lizzie Wilson, all of whom are negroes.

"That the witnesses above named, P. W. Perkins, Oscar Wilson and Lizzie Wilson would testify if present and sworn in court in above case, that they were each present at the time and place of the shooting of the said Clifford Garrison. That said witnesses, Oscar Wilson and Lizzie Wilson were having trouble between themselves. That defendant endeavored to pacify them by asking said Wilson not to strike Mrs. Wilson, whereupon, the said Wilsons went outside the house and were in the yard and the defendant also went into the yard with them. That thereupon the said Clifford Garrison appeared and asked defendant if he and Wilson were having trouble. That defendant answered said Garrison that they were not. That thereupon the said Clifford Garrison said to defendant, "You are a God damned liar," and reached down and picked up a piece of an iron bed rail from four to five feet in length and of weight and strength sufficient to have easily crushed defendant's skull with a slight blow therefrom, and struck with it at the head of defendant. That defendant partly dodged the blow, but received a considerable blow therefrom upon his head. That at the same time that said Garri-

son struck at defendant but as the iron struck defendant's head, the shot was fired which wounded the said Garrison and that had same not been fired, the blow by Garrison would have killed defendant. That defendant did not have the fire-arm in his hand and did not draw same until after said Garrison was striking at defendant with said iron bar. That defendant had but a few minutes before taken said pistol from the house of Mr. and Mrs. Wilson with the stated purpose of preventing the said Wilsons from using same in the trouble between them.

"That after said shooting of said Garrison, the friends of said Garrison and white persons residing at the town of Snyder scared said witnesses and caused them to at once leave said town by threatening them that if if they did not leave they would kill them. That in fear of the carrying out of said threats, said witnesses with the exception of said Perkins left said town going to various places distant therefrom. That defendant was arrested within a few minutes thereafter and has ever since been in custody of the officers and in confinement as aforesaid.

"That said witness Perkins was also arrested and kept in confinement in the jail at Hobart, Oklahoma, for several days and was finally discharged and released, but was also intimidated by threats of violence made by white persons unknown to affiant, in case he returned and testified in behalf of defendant at the trial of said cause. That said Perkins after his release went to the town of Clinton in Custer county and was there engaged in laboring at an oil mill until within the last few days. That upon the 27th day of April, 1915, and before affiant or his attorney knew that said witness Perkins had left the town of Clinton, affiant by his attorney filed in the court clerk's office a praecipe for a subpoena for said witness Perkins to be issued to the sheriff of Custer county, Oklahoma, and also procured the same to be endorsed by the honorable judge of this district, requiring said witness to attend this court on May 8, 1915, at 9 o'clock a. m., thereof. That said subpoena was duly issued and delivered to said sheriff and said sheriff made diligent search for said witness Perkins but was unable to find him for the reason that said witness had left said town of Clinton prior to that time as affiant now believes. That said subpoena has been duly returned into this court showing that said sheriff was unable to find said witness after diligent search in said county, said subpoena is referred to and made an exhibit No. 1 of this affidavit. Said praecipe is made a part hereof as exhibit 2 hereof. That upon the return of

said subpoena into this court affiant by his said attorney, wrote to said witness at Clinton, asking him to come to this court on May 8, 1915.

That during the months of March and April, 1915, affiant's attorney had letters from said witness Perkins at Clinton, Oklahoma, and said witness had promised affiant's attorney that he would come to affiant's trial and testify for him to above facts. That he would keep affiant's attorney posted as to his whereabouts until said trial and if he left said town of Clinton that he would advise said attorney of his address.

That one of said letters is attached hereto, marked exhibit 3 and made a part hereof. That others of said letters have been mislaid and lost. That said witness is not present at the trial hereof and is absent without the procurement of affiant and against his will. That said absent witness has a relative named Allen Yarborough whose post office is Boswell, Oklahoma. That affiant's said attorney has written to said Yarborough to learn the address of said Perkins but so far has received no reply, though inclosing return postage, but will doubtless receive a reply within a short time.

That affiant is informed by negroes at Hobart that said witnesses Oscar Wilson and Lizzie Wilson, after being frightened away from the town of Snyder where said shooting occurred, went to Vernon, Texas. That affiant by his counsel duly caused subpoenas to be issued for said witnesses to the sheriff of Kiowa county, state of Oklahoma, and same have been returned unserved after diligent search by said officers for said witnesses in said county. That affiant's said attorney also caused the clerk of this court to send subpoena by registered mail to said witnesses at Vernon, Texas, in the state of Texas, but affiant is informed and believes that same has been returned uncalled for. That said attorney also caused said clerk to send subpoenas to all of said witnesses by registered mail as well as issuing same to said sheriffs of said different counties of Oklahoma with the command of said judge endorsed thereon for the attendance of said witnesses.

"That said witnesses, Oscar Wilson and Lizzie Wilson would if present, testify to matters set forth above and the same are true as affiant believes and affiant cannot prove said facts so well by any other witnesses. That said witnesses, Wilsons, are absent without his procurement and against his wishes. That the witnesses above named and whom have been subpoenaed for defendant, did not see all of the matters and things seen and

heard by said absent witnesses. That affiant refers to said praecipes and subpoenas and the returns thereon for said witnesses Wilson and makes them a part of this showing and affidavit. That affiant cannot safely proceed with the trial without said witnesses. That affiant believes that his witnesses who have been subpoenaed will know the whereabouts of his said absent witnesses and that he will ascertain the same at the earliest possible moment and procure their attendance or depositions in time for his trial, if this cause be continued a sufficient time to do so.

"That the feelings of the white people residing at Snyder, Oklahoma, where said shooting occurred are very hostile toward affiant and his said witnesses who are all negroes. That shortly after the death of said Garrison, a mob was formed as affiant is informed and believes, to lynch him, and that the sheriff of Kiowa county was compelled to place affiant in the state reformatory at Granite, for a considerable time to prevent his being lynched by the said citizens of Snyder. That by reason of said feelings toward affiant and his witnesses, his said witnesses are afraid for their lives should they appear and testify in his behalf and affiant believes that that is the reason that they have evaded the service of process for their attendance at affiant's trial. That this application is not made for delay merely but that justice may be done. That affiant has used due diligence to procure the attendance of said absent witnesses and their testimony is material to his defense and necessary thereto.

"Affiant further says, that the facts above set forth are the facts of the case and are each and all true.

"That each of said witnesses have resided in Kiowa county, state of Oklahoma, for some time preceding said shooting. That if they have since changed their residence from said county, affiant only knows the facts above set forth in regard thereto.

"That all attached exhibits are made a part hereof and are true copies where they appear to be copies of letters written and mailed."

A corroborating affidavit of his counsel, L. M. Keys, is as follows:

"That all allegations therein contained which refer to things done and information had by the attorney of defendant are true, and the same are within the knowledge of affiant."

In support of his application for continuance, Will Fullingame, was called as a witness and testified that he had lived eight

years in Snyder; that following the shooting a crowd gathered and threats were made against the negroes by several persons, including witness, and the negroes all left Snyder and he had not seen any of them back there since that time. Also, C. H. Fawks, who testified that he was in the banking business at Snyder, and that the negroes in Snyder all left within a few days after the shooting, that the negro janitor of his bank left there the next day. That if the negroes were driven away he did not know it.

Jimmie Campbell, colored, testified that he was living at Snyder at the time of the shooting and knew Oscar Wilson and Lizzie Wilson, his wife; that he did not know why they left Snyder, that after the shooting he left Snyder with three other colored boys.

We are inclined to the opinion that under the peculiar circumstances surrounding this case the trial court abused its discretion in refusing to grant a continuance. The application conformed to the requirements of the statute and the diligence to procure the attendance of the absent witness, P. W. Perkins, was unquestionably sufficient, and was uncontroverted in the court below.

The only witness who testified to the facts alleged in the application was the defendant himself, and the testimony of the absent witnesses was material to his defense, and it reasonably appears that the attendance of the witness Perkins at least could be secured by a continuance. The defendant was entitled to a fair chance to defend his life.

Speedy trials and the prompt enforcement of the criminal laws, however desirable, should only obtain with a due regard for the rights of the accused to enable him to have a fair trial. We think that in this case it was manifest error to refuse a continuance.

The next contention is that the court erred in overruling the defendant's challenge to the juror J. B. Kissinger. Upon the examination of said juror touching his competency to serve as a juror in said cause, he stated that he had heard detailed what purported to be all the facts of the case by two men from the town of Snyder, and on his *voir dire* he further testified as follows:

EXAMINATION BY THE COUNTY ATTORNEY.

"Q. Did this gentleman detail what purported to be the facts and circumstances in this case? A. Supposed to—yes, sir.

"Q. Was he a witness in the case? A. I don't know.

"Q. Have you any opinion at this time relative to the guilt or innocence of the accused? A. (No answer).

"Q. You know, Mr. Kissinger, whether you have a fixed opinion at this time relative to the guilt or innocence of the defendant, don't you? A. Well, I couldn't say; if that evidence was produced on the stand it would take pretty strong evidence to over-power it.

"Q. Do you know of any reason why you should not be selected as a juror in this case? A. Well, just as I say.

"The county attorney: We pass the juror for cause:

"Examination by counsel for the defendant:

"Q. Now, you heard some one that claimed to be from Snyder, talking about the facts in this case? A. I did.

"Q. Did he relate in your hearing what purported to be the facts in the case? A. Well that was what he said.

"Q. He said they were the facts? A. Two men there on the street and he told the circumstances.

"Q. How long did you listen to this talk? A. I never paid any attention; I was just sitting there and wasn't over five feet from them.

"Q. You heard then, practically the whole conversation? A. Supposed to be.

"Q. Heard what purported to be a complete relation of the facts in the case? A. Just what I have said.

"Q. And from that you formed an opinion? A. Yes, sir.

"Q. Now, Mr. Kissinger, are you able to lay aside that opinion, entirely, and as a juror and under your oath as a juror in this case to try this case fairly and impartially and base your verdict entirely upon the evidence produced here in the court room, under the charge of the court? A. Well, if that testimony was produced on the stand it would take a responsible witness to overpower that evidence.

"Q. Then you have such an opinion in this case as would require evidence to remove, at this time? A. Yes, it would require evidence.

"Q. You don't believe that you can be a fair and impartial juror? A. I couldn't go into that jury box with that evidence on the stand and change my opinion from what I heard then.

"Counsel for defendant: We challenge the juror:

"Examination by the court: Now, can you say that you can eliminate that from your mind, if you are retained on the jury, and try the case on the law given by the court and on the evidence of the witnesses introduced here? A. (No answer).

"Q. Are you knowing that condition that you can eliminate that and try it on the evidence that is introduced? A. Oh, I can put that aside and go according to the law and evidence produced on the stand.

"Q. You can do that Mr. Kissinger? A. Yes, sir.

"Q. And will do that if retained on the jury? A. If I am retained on the jury I will.

"By the court: Challenge overruled."

Our Procedure Criminal provides that:

"No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him." (Section 5861, Rev. Laws.)

This court in construing this section of the statute in the case of *Turner* v. *The State,* 4th Okla. Cr. 164, 11 Pac. 988, says:

"One accused of crime is by the constitution guaranteed a fair and impartial trial (Const. Bill of Rights, Sec. 20), but to insure this, it is not meant that jurors shall never have heard of the case, or shall not have any impressions concerning any of the facts. In this day and age it would be difficult to find citizens competent for jury service who have not some impression as to the case, derived from newspaper accounts. The constitutional guaranty only excludes those jurors who have an opinion upon the merits of the case, upon the guilt or innocence of the accused of the crime charged, based upon such testimony as may reasonably be expected to be presented upon the trial, or an opinion founded on personal ill-will towards the accused . . . As we construe the statute the competency of a juror is a question of fact to be determined by the court in the exercise of a sound discretion and constitutes a legislative definition of the constitutional provision; however, it can not be regarded as changing in any degree the essential qualifications which jurors must possess. It merely furnishes a test by which those qualifications are to be determined. It makes the declaration of the

juror, 'that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him, competent, as bearing upon the question of his impartiality, and requires the court to consider such declaration, when so made.' The statute does not attempt to determine what shall be the probative force of the declaration of the juror, or how far it shall have the effect of relieving him on the disqualification arising from such an opinion. The declaration when so made is evidence to be received and given such weight as, under all circumstances appearing, it is fairly and justly entitled to. Before it can operate to remove the disqualification, the court must be satisfied of its truth, and that question is left to be determined from all the facts and circumstances appearing from his examination upon the *voire dire*."

In the case of *Scribner* v. *The State,* 3rd Okla. 601, 108 Pac. 422, 35 L. R. A. (N. S.) 985, Justice Owen, delivering the opinion of the court said:

"It has been urged in this case that on the evidence produced the jury could not have returned other than a verdict of guilty, and therefore the defendant was not prejudiced by reason of the fact that some of the jurors had formed an opinion as to his guilt. As to whether a different verdict could not have been returned on the evidence, we are not called upon to decide. We might concede that such is true; that being true, we cannot agree that the defendant was not deprived of the rights guaranteed to him under our constitution. The fact remains that this jury fixed his punishment at death. In determining this case, although the evidence may show the defendant guilty beyond all peradventure of a doubt, and sufficient to support a verdict with the death penalty, we must nevertheless set a precedent under which a perfectly innocent man may be tried and have preserved to him his constitutional rights of the presumption of innocence, and a trial before an impartial jury. If a jury has prejudged the guilt of the defendant before hearing the sworn testimony, then it cannot be said that the defendant had a trial before an impartial jury. It is a physical impossibility for a juror, who has an opinion based on what he has understood to be the facts in the case, to weigh the evidence as though he had never heard of the case and had not already made up his mind. He may have an earnest and conscientious desire to do so and to deal out exact justice, but he will unconsciously attach a greater weight to the evidence which conforms to his preconceived opinion than he would otherwise do. He is not in that frame of mind which the constitution contemplates, and which is necessary to enable him to fairly and

impartially judge as to the weight to be given to the evidence of each witness appearing before him."

The question of the competency of the jurors as involved in this case differs widely 'from the question concerning the same subject decided in the case of *Gentry* v. *State,* 11th Okla. Cr. 355, 146 Pac. 719, wherein it is held:

"The trial court's refusal to sustain a challenge to a juror for cause will not be disturbed by an Apellate Court, where it appears from the examination of such juror that he had not talked with any one who purported to know about the case of his own knowledge, but had read full accounts of the tragedy in the newspapers, and that he had no opinion other than that derived from reading newspapers, and that he was positive that he could disregard that opinion, and try the case solely upon the evidence, fairly and impartially."

We are of the opinion that before the trial court can exercise any judicial discretion in retaining upon the panel a juror who states on his *voir dire,* that he has formed an opinion as to the guilt or innocence of the defendant, it must be shown by an examination of the juror, not only that his opinion was formed solely in the manner named in the statute, but, in addition to this the juror must declare unequivocally that he can and will, notwithstanding such opinion act impartially and fairly upon the matters to be submitted to him.

There is nothing in this case that tends to show that the opinion of the juror was formed upon rumor, newspaper reports or common notoriety. It appears from the examination of the juror that he had formed a fixed opinion from what he had heard said by one who purported to know all about the case of his own knowledge, and he stated, "I couldn't go into that jury box with that evidence on the stand and change my opinion from what I heard there." He further stated that: "If that evidence was produced on the stand it would take pretty strong evidence to overcome it."

In the case of *Tegler* v. *The State,* 9th Okla. Cr. 138, 130 Pac. 1164, it is held that:

"Where a juror testifies on his *voir dire* that he has a fixed opinion as to the guilt ·of a defendant which it will take strong

evidence to remove, and that he was then upon one side of the case, such juror is clearly disqualified, and the mere fact that the juror may be of the opinion that he can try the case fairly and impartially by the testimony heard in court and the instructions of the judge, does not qualify such juror."

Unquestionably the juror Kissinger was clearly incompetent to sit as a juror in the case, and as the defendant exhausted all of his peremptory challenges, we must hold that the error in overruling the challenge was prejudicial to the substantial rights of the defendant.

It is next contended that the court erred in excluding evidence of the dying declarations of the deceased.

Dr. J. A. Muller testified that he was duly licensed and had been in the practice of medicine and surgery about fifteen years and was called to attend the deceased immediately after the shooting and found a gun-shot wound in the abdomen; that they placed him on a cot and carried him to Mr. Broadstreet's, and about two-thirty that afternoon, along with his father and another gentleman he went with him on the train to Lawton where he placed him in the hospital, and there with Dr. Myers performed the operation of resetting the bowels. That it was necessarily a fatal wound, "that the intestines were cut in nine different places; the mesentry, that is the membrane which hangs down between the intestines and the abdominal wall was lacerated so that there was over two quarts of blood in the abdominal cavity; that alone would have caused death."

On cross-examination he stated that the deceased made a statement to him about half an hour after he first saw him.

He further testified as follows:

"Q.  Did he make any statement to you, or did you make any statement to him, relative to the prospects of his being able to recover from that wound?  A.  I stated to him that it would be necessary to go to the hospital at once as gun shot wounds in the intestines were always dangerous and it would be necessary to have an operation to see the condition of the intestines.

"Q.  Did he make any expression as to his opinion at that time as to whether or not those wounds were fatal?

"By counsel for the state: Objected to as incompetent, irrelevant and immaterial.

"By the Court: Overruled.

"A. Yes.

"Q. You may state what he said on that subject?

"Counsel for the state objects and the jury is excluded from the court room.

"Q. What, if anything, did the deceased say to you, relative to his opinion as to whether or not he was going to die or would recover from those injuries at that time? A. Why, he said, "they shot me through the guts, and they got me," that's all he said.

"Q. Where was that remark made, Doctor, with reference to the time that he made the statement as to the cause—how these injuries occurred? Was it before or afterward? A. This was before.

"By the court: If that is all the statement you have I will exclude it.

"By counsel for defendant: I will probably be able to get others. We except to the ruling of the court and request that witness remain as a witness for the defendant."

Ed. L. Jones, as a witness for the defendant testified that he was deputy court clerk at Snyder; had been acquainted with the deceased for about twelve years; that he saw the deceased immediately after he was shot and that Dr. Muller was there.

He was then asked:

"Q. Did you hear any statement made by other persons in his presence at that time, relative to the possibility of the deceased getting well or the improbability of his getting well? A. Yes, sir.

"Q. You may state what was said and by whom it was said?

"By counsel for the state: Objected to as incompetent, irrelevant and immaterial. No proper foundation laid.

"By the court: This is as to his condition. Overruled. Not what he said now, unless it refers to his recovery.

"Q. Did he express, in your presence, any opinion relative to whether or not he was going to get well or would die from the effect of his wounds? A. Not directly.

"Q. Was any statement taken down at that time by any one, that was made by the deceased?

"By counsel for state: Objected to as incompetent, irrelevant and immaterial; no proper foundation laid.

"By the court: He may answer yes or no to that.

"A. There was one attempted.

"Q. Who took it down? A. I tried to take it down.

"Q. Was anything said to the deceased in your presence by any one to the effect that his wounds would be fatal or that he might not recover? A. No, not to my recollection.

"Q. What became of the statement that was taken by you?

"By counsel for the state: Objected to as incompetent, irrelevant and immaterial.

"A. I don't remember.

"Q. Haven't you that statement, that written statement, in your possession at this time? A. No, sir.

"Q. What did you do with it?

"By counsel for state: Objected to as incompetent, irrelevant and immaterial.

"By the court: Sustained.

"Defendant excepts.

"Q. How did you come to take the statement down?

"By counsel for the state: Objected to as incompetent, irrelevant and immaterial.

"By the court: Sustained.

"Q. Did the deceased request you to take a statement from him?

"By counsel for the state: Same objection.

"By the court: Sustained.

"By counsel for the defendant: We except, if the court please I think that would be the strongest indication possible."

The rule is universal that before dying declarations can be admitted in evidence it is essential, and is a preliminary fact to be proved by the party offering them in evidence that they were made under a sense of impending death. It is the duty of the court to determine in the first instance the admissibility of declarations sought to be introduced as dying declarations and the court must pass upon the competency of such evidence as a question of law, or as some courts hold as a mixed question of law and fact. In laying the predicate for the admission of dying declarations, the expressions or statements of the deceased are always admissible if made at or about the time the declarations were made, "or even if made before or after the making

of the declarations. Such a statement is not vitiated by being written down as a part of the documentary evidence by which the dying declaration is also proved."

2 Michie on Homicide, p. 1091 and cases cited.

There can be no question as to the materiality of the evidence offered and rejected by the court in sustaining the objections to the last three questions above quoted. That the deceased made statements tending to show that he was without hope of recovery, is not disputed. The defendant had the right to introduce this important and competent evidence for the consideration of the court in order that the court might properly determine the question of the competency of the dying declarations, and these adverse rulings passed beyond the limits of the discretion of the court and were erroneous as a matter of law.

However, the evidence offered and received by the court we think sufficient to entitle the statements of the deceased to be admitted in evidence as dying declarations. Considering the extent and character of the wounds which the doctor testifies were necessarily fatal, and it appearing that he so informed the deceased, the deceased was shown to have knowledge of the character of his wounds and such knowledge was not of a nature to give him any hope of recovery, and his statement, the only one that was not excluded by the court, shows that he believed that he was mortally wounded. A sense of impending death may be inferred from the character of the wound; from the opinion of his physician and from other circumstances showing his state of mind.

Says Greenleaf:

"It is enough if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case,—all of which are resorted to in order to ascertain the state of declarant's mind." Section 158.

On a trial for murder the dying declarations of the deceased are not limited as evidence in favor of the state alone, but are equally admissible in favor of the defendant.

In *Maddox* v. *The United States,* 146 U. S. 140, 36 L. ed. 917, the Supreme Court of the United States held:

"Dying declarations are admissible on a trial for murder as to the fact of the homicide and the person by whom it was committed, in favor of the defendant as well as against him, if made by the party injured under a sense of impending death."

In the case of *Rex* v. *Scaife,* 1 Moody & R. 551, Coleridge, J., received as evidence the following dying declaration, viz: "I don't think he would have struck me if I had not provoked him." Observing, when he admitted it that it might have an influence on the amount of punishment.

In *State* v. *Ashworth,* 50 La. Ann. 94, 23 So. 270, the Supreme Court of Louisiana, held that:

"Rules of evidence relative to the admissibility of dying declarations are not to be as rigorously applied when the fact itself of their having been made has been satisfactorily established, and they are in favor of the accused, as when they are sought to be urged against him."

In speaking of such declarations in favor of the accused, the Kentucky Court of Appeals say, in the case of *Haney* v. *Comm.,* 5 Kentucky L. Rep. 203:

"Such declarations are not merely opinion; they were uttered by a participant whose opportunity for knowing whether he was to blame was greater than that of any one else, and explain the intent and motive with which he was actuated in the part he played, and exhibit those internal facts, constituted of feeling, motive and judgment, which will greatly assist the jury in understanding the true nature and object of his acts as proven by other witnesses.

"To the general rule excluding matters of opinion or belief, an exception should be made allowing the declarations of the deceased in behalf of the accused, where they will explain the acts and conduct of the deceased, or show his feelings or motives, intent or belief, when they are essential to qualify or aggravate his conduct. These are facts which, were he living, he could be compelled to testify to as a witness, and while they are generally treated, because of the mode of expression used as utterances of

opinion or belief, they are essential and original facts which go far to illustrate the motives and give meaning to the acts of the declarant who speaks, in such instances, of his own acts, whose scope and effect he understands, and not those of the accused alone. The admission of such declarations can do no harm. Frauds cannot be practiced under cover of the rule. And there is not so much danger of misconception or perjury as where the declarant speaks from hostile feelings, surrounded by sympathizing friends, ready to construe his words as favorable to their own views, as may reasonably be done."

We are inclined to think that the declarations of the deceased made between the time the fatal shot was fired and the taking of his statement in writing by the witness Jones, were competent and admissible as a part of the *res gestae*. No fixed measure of time or distance from the main occurrence can be established as a rule to determine what shall be a part of the *res gestae*. Each case must necessarily depend on its own circumstances to determine whether the facts offered were really part of the same continuous transaction. See *Price* v. *State,* 1 Okla. Cr. 369, 98 Pac. 447.

It is said in Am. and Eng. Ency. of Law, Vol. 24, p. 662:

"The difficulty of formulating a precise rule by which the admissibility of evidence under the doctrine of *res gestae* shall be determined is admitted by all the authorities, but it may be stated generally that wherever it becomes important to show upon the trial of a cause a particular fact or event it is competent and proper also to show any accompanying facts and circumstances which are actually or substantially contemporaneous with it and calculated to elucidate and explain its quality and character, and so connected with it as to constitute one transaction, the rule including accompanying declarations, as well as acts, although such declarations would, apart from this doctrine, be excluded as hearsay."

And again the rule is well stated that if such declarations "are made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterances of thought created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation and design, they will be admissible as part of the *res gestae.*"

Here, the witness fixes the interval of time as about thirty minutes, and it would seem that the continuity of the events was not broken. The declarations were by a person best qualified to know the facts and were made at a time and place, and under circumstances, which effectually excluded the presumption that they were the result of premeditation and design. If such declarations were in fact made by the deceased, they were of the very highest importance in the case, and should have been admitted. A defendant in a capital case has the right to submit competent and material evidence in his behalf to the jury, in order that it may pass upon its weight and credibility, and, if he be deprived of that right, it is a substantial one, which, when properly presented to this court by an exception, will require a reversal of his conviction.

Finally, it is contended that the court erred in permitting the prosecuting attorney in his argument to the jury to use language prejudicial to the defendant. From the record it appears that the prosecuting attorney in his opening argument referred to the defendant as, "This Black Murderer." On objection being made the court admonished counsel for the state to be temperate in his remarks. In the course of his closing argument for the state, the prosecuting attorney used the expression, "This coal black murderer." Counsel for the defendant again objected, but the court peremptorily overruled the same.

We are of opinion that the language used by the prosecuting attorney was highly improper and the failure of the court to rebuke him, or to properly charge the jury with reference to the matter, constitutes reversible error in a capital case. The personal opinion of the prosecuting attorney is not evidence and the sanction of such an opinion by the court is prejudicial error. The defendant, a negro, was on trial before a white jury, charged with the murder of a white man, and as an appeal to race prejudice, the language used was plainly calculated to prejudice the defendant. Race prejudice has no more sanction at the bar than on the bench.

In *Tannehill* v. *The State,* 159 Ala. 51, 48 So. 662, the Supreme Court of Alabama reversing a conviction for murder says:

"It is the duty of the court to see that the defendant is tried according to the law and the evidence, free from any appeal to prejudice, or other improper motive and this duty is emphasized where a colored man is placed upon trial before a jury of white men."

And see cases collated in note to *Hardaway* v. *State,* 29 Ann. Cas. 1167.

The law of the land guarantees to every one accused of crime, regardless of race or color, whether of high or low degree, whether rich or poor, a fair and impartial trial, and if that right has been infringed, not in respect to mere technicalities, but in disregard of substantial rights, however undesignedly, the judgment of conviction should be reversed and a new trial awarded.

Upon the whole case we are without doubt as to the propriety and necessity of reversing this judgment. For the reasons stated, the judgment of conviction is reversed and the cause remanded for a new trial. It is further ordered that the warden of the penitentiary deliver the defendant to the sheriff of Kiowa county, who will hold him in custody until otherwise ordered according to law.

FURMAN and ARMSTRONG, JJ., concur.