## MELVIN STEPHENS v. STATE.

*No. A-2200.    Opinion Filed October 23, 1915.*

(152 Pac. 138.)

1. **INDICTMENT AND INFORMATION—Motion to Quash—Variance from Complaint.** When it appears that the charge in the complaint before the committing magistrate is substantially the same as that charged in the information, a motion to quash on the ground that the offense charged in the information differs from that charged in the complaint upon which the defendant was held to answer is unavailing, and was properly overruled.

2. **CONTINUANCE — Discretionary Ruling — Appeal.** The granting or refusal of a continuance rests in the sound discretion of the trial court, and a ruling of that court will not be reviewed, unless an abuse of discretion is shown.

3. **APPEAL—Verdict—Evidence.** In a prosecution for the larceny of live stock, the evidence examined and held sufficient to sustain the conviction, and that no material error was committed on the trial.

*Appeal from District Court, Muskogee County;*
*R. C. Allen, Judge.*

Melvin Stephens, convicted of cattle theft, appeals. Affirmed.

The statement of facts as set forth in the attorney general's brief in this case is as follows:

"Melvin Stephens, an unmarried negro, at the time of this larceny, was living in the city of Muskogee. His father, George Stephens, was living on a farm in McIntosh county, about fifteen miles south of Muskogee.

On Saturday, the 3rd day of May, 1913, George Stephens came to Muskogee. He drove a double team to a buggy, one of the horses being grey. He arrived at Muskogee about noon of that day and put his team in a stable where his son Melvin kept a little sorrel roan mare. Melvin and George both claim that they did not see each other on the occasion of this visit.

On that night, Mr. E. S. Stockwell had a yellow Jersey cow stolen from a lot in the city of Muskogee where the cow had

been staked out for the night. The cow was missed about six o'clock in the morning following and her loss immediately reported to the sheriff's office.

The sheriff and one of his deputies at once started a search and about four o'clock that evening found the cow hid in the brush, on George Stephen's farm fifteen miles south of town. There had been a rain that night and the tracks of the cow and a horse were followed.

Persons along the way saw some negro, riding a grey horse, drive a yellow cow in that direction early in the morning. These witnesses were unable to positively identify that person as the defendant, but recognized the horse as the one owned by George Stephens, and one of the witnesses believed the rider to be Melvin Stephens.

There is no dispute in this case but that the cow of Stockwell was stolen on the night of May 3, 1913, and immediately driven, by some one riding George Stephens' grey horse, to George Stephens' farm fifteen miles south. The defendant, however, relied upon an alibi, claiming that on the night in question he left Muskogee on the south bound Katy train between the hours of eight and nine and went to Stringtown, Oklahoma, in Atoka county and worked there from the 5th day of May until the time of his arrest in the following month.

Defendant admits that he took his father's grey horse out of the stable on Saturday evening; that he put a saddle and bridle on it; that he took it without his father's knowledge or consent; but, he says, that one Eugene Moore, another negro who looked just like him (just his color, weight, age and height) wanted a horse to ride out into the country five or six miles and as his (Melvin's) sorrel roan mare was lame that he (Melvin) after searching around for his father and failing to find him, took the liberty of letting Eugene Moore use his father's grey horse, with the understanding that Moore would take the horse, after using it, to his father's farm south of town.

Melvin says this generous offer of his was accepted by Moore and that the last time he saw the old grey horse was that evening just before he took the train for Stringtown. At that time Moore had not departed on his trip.

Now just how Melvin expected the old man to get back home with the use of his little lame sorrel roan mare is not disclosed by the record, but having requested Moore to take the

grey horse home to the old man, he (Melvin) must have thought the old man would use the sorrel roan mare, because he knew the old man had to have a double team to return with.

Now if the sorrel roan mare was too lame for Moore to ride five or six miles why wasn't she too lame for the old man to drive fifteen miles? Melvin doesn't explain.

Another thing; why should Moore if he wanted to steal a cow, drive the animal to old man Stephens' place?

The evidence shows that Moore had never been there, at least before that time. How did he know the way on a dark rainy night and why should he select that time to make the trip, and, why if Melvin is telling the truth, didn't Moore when he had returned from his trip into the country and found that old man Stephens had not yet departed for home, why is it that Moore didn't leave the grey horse in the barn and let the old man take it home himself? The old man never started home until the Sunday following.

We'll admit that a nice, slick, yellow milk-giving Jersey cow has its attraction, but the unusual and uncalled for generosity on the part of Moore is only exceeded by his remarkable resemblance to the defendant.

Moore is the most unusually accommodating individual of whom it has ever been our pleasure to read.

For the use of this grey horse for a five mile ride, he is willing to deliver him fifteen miles and take his chances of finding some way back, and then, his unusual generosity bubbling up, he thought it incumbent upon him to present the old man with a nice Jersey cow, a little token of his appreciation, for the use of the grey horse, and still not satisfied, Moore is so accommodating as to present for Melvin in his dilemma—a perfect counterpart.

> Oh, Eugene Moore, with all your arts,
> You are a man of "many parts;"
> Combine your arts and diverse acts
> 'Twould make a book like "Moore on Facts."
> If milk we need, you find the cow,
> It matters not just where or how,
> And when we need a duplicate you're there,
> Like Mel in weight, height and color of hair.

Oh, Moore, old boy, you'll never know
How great is our affection,
But rest assured, where ere you go,
We made a good selection.
And if, by chance, you should return,
"For better or for worse,"
Come 'round and serve out Melvin's term
And ride to "the pen on the old grey horse."

EDWARD CURD, JR.,
*For plaintiff in error.*

SMITH C. MATSON,
*Asst. Atty. Gen., for the State.*

DOYLE, P. J. The plaintiff in error, Melvin Stephens, was 'tried in the District Court of Muskogee county on an information charging him with the theft of a cow. The jury found him guilty, but failed to agree upon the punishment. The court rendered judgment and sentenced him to be imprisoned in the penitentiary for the term of five years. To reverse the judgment he appeals.

The first assignment of error relied upon to-wit: "That the court erred in overruling the motion to quash and set aside the information, because the defendant had not been given a preliminary examination," is wholly without merit. In that it appears that the only variance between the preliminary complaint upon which the defendant was held to answer and the information filed in the District Court is that the preliminary complaint included an allegation as to the value of the animal stolen. This allegation was mere surplusage. *Crowell* v. *State,* 6 Okla. Cr. 148, 117 Pac. 883. The preliminary complaint was sufficient to charge the crime of larceny of a domestic animal, and the record shows affirmatively that the defendant had a preliminary examination. See *Panosky* v. *State,* 8 Okla. Cr. 116, 126 Pac. 451.

The next assignment is that the court erred in overruling the defendant's motion for a continuance. The granting or refusal of a continuance rests in the sound discretion of the trial court, and a ruling of that court will not be reviewed, unless an abuse of discretion is shown.

We think the motion for continuance was properly overruled.

Another assignment of error is based upon an exception taken to the instruction on the defense of alibi. This assignment is hypercritical.

The trial court instructed the jury in part as follows:

"Bearing in mind this instruction, you are instructed that if upon considering the evidence of alibi in this case you entertain a reasonable doubt as to whether or not the defendant was present at the time and place of the commission of the offense charged in the information herein, you should acquit him."

And also instructed the jury that if upon a consideration of all the evidence in the case the jury entertained a reasonable doubt of the defendant's guilt, it was their duty to acquit him. The defense interposed by the defendant and the law applicable thereto was fully and fairly submitted to the jury in a charge that was not subject to legal objection.

Finally, it is insisted that the evidence is insufficient to sustain the judgment. There cannot be any serious ground for this claim. We have seldom seen a stronger case of circumstantial evidence and the rule is well settled, that this court will not disturb the verdict on account of the evidence, when there is evidence to support it. The judgment is therefore affirmed.

FURMAN and ARMSTRONG, JJ., concur.