## JESS BROWN v. STATE.

No. A-2937.   Opinion Filed September 29, 1918.

(175 Pac. 66.)

1.   **CONTINUANCE—Discretion of Trial Court.** Applications for continuance on the ground of absent witnesses are addressed to the discretion of the trial court, and a judgment of conviction will not be disturbed on appeal unless there appears to have been a manifest abuse of such discretion.

2.   **SAME—Absent Witnesses.** Where a continuance is asked on account of the absence of a sick witness, there should be a showing that the witness is sick, and unable to attend the trial, and also that there is a reasonable probability that such witness will be able to attend at the time or term to which a continuance is asked. Where there is no such showing, there is no abuse of discretion in overruling the motion.

3.   **HOMICIDE—Self-Defense—Instructions.** Certain instructions on the law of self-defense examined, and **held** erroneous and prejudicial to the defendant in this case.

*Appeal from District Court, Hughes County;*
*George C. Crump, Judge.*

Jess Brown was convicted of the crime of manslaughter in the first degree, and sentenced to serve a term of four years in the penitentiary, and he appeals. Reversed.

STATEMENT OF THE CASE.

J. B. Eaton was shot and killed by the defendant, Jess Brown, in Hughes county, Oklahoma, at the defendant's home, on September 12, 1916. The shooting took place at the south side of the defendant's house. Only one shot was fired.

The defendant, Jess Brown, was a farmer, 21 years old, and had lived in Oklahoma nearly all his life, in Hughes county for about four years. At the time of the killing, he

had a wife and one child living with him, and he was living in a house on the farm of the deceased, which he had previously rented from the deceased. His reputation in the neighborhood for being a peaceful and law-abiding citizen was good.

J. B. Eaton, the deceased, was 46 years old, and had been living on his farm, near the town of Allen, four or five years previous to his death. There was a conflict in the testimony as to whether the reputation of the deceased for peace and quietude was good. Witnesses for the defendant testify that such reputation was bad, while other witnesses in rebuttal on behalf of the state testify that it was good. The consensus of opinion of these witnesses, however, was that the deceased was a quarrelsome man, but not dangerous. The evidence shows that the defendant and the deceased had been on friendly terms up until a few days before the homicide. The homicide occurred on Tuesday morning. On the Saturday previous, the deceased had gone to the defendant's home and offered an insult to the defendant's wife. When the defendant came home from work on Saturday evening, his wife informed him that the deceased had been at the house and had insulted her, detailing to the defendant the substance of what the deceased had done and said. This narrative apparently angered the defendant, and he immediately repaired to the deceased's house, a short distance away, armed with a shotgun, and a conversation took place between the defendant and the deceased at that time and place. In this conversation the deceased did not deny that he had been to defendant's home when accused thereof by the defendant, attempting to paliate such offense by saying to the defendant, "All men have their faults, and he reckoned that was his reason." The defendant cursed the deceased and

told him that he was "no man"; but nothing of a serious nature happened at that time, as the defendant's wife had followed him over there, and called him away, and the defendant followed her back to his home.

After all this occurred, the proof on the part of the defendant and his witnesses is to the effect that the defendant immediately got ready to leave the place where he was living and secure another house to live in. He and his wife did not stay in the house on Eaton's place after what had occurred there on Saturday. They went over to the home of the father-in-law of the defendant and stayed there. After several unsuccessful attempts to procure another house to live in, the defendant finally bought a tent to live in, and was going to erect the tent on land owned by his father-in-law, some two miles distant from the deceased's farm.

There is also evidence in the record on behalf of the defendant that the deceased was in the town of Allen on the Saturday afternoon before the killing, and proposed to sell his place to Sam Forney, a lumberman living in Allen, and gave as his reason for wanting to sell out that he was in trouble with Jess Brown, and might have to kill him over family troubles. On the morning that the killing took place, the defendant and two of his relatives were over at the house of the defendant for the purpose of moving the household goods. They had loaded one load on to a farm wagon and these relatives of the defendant had taken the load away, the defendant staying at the house until they returned for another load. In the meantime the deceased, who was gathering corn not far from where the defendant lived, and just south of the house, apparently having seen the wagon drive off from the house, went up there to see what was happening, the deceased being accompanied by

his 14-year-old son, Plato Eaton, who was the chief witness to the killing on the part of the state; the only other eye witness to the killing on the part of the state being the daughter of the deceased, who testified that she was standing on a wagon load of corn about 40 or 50 yards from where the killing took place.

The testimony of these two witnesses is in substance as follows: That they and their father were gathering corn not far from where Jess Brown lived, and they saw Jess Brown and some other men drive up to Jess Brown's house, and begin to load a wagon, and then the wagon drove off; that the deceased said he believed he would go up and see if they shut the gates and moved out; that Plato Eaton went with the deceased; that the house that Jess Brown lived in was a two-room house facing west, a front room, and a back room; that the front door was closed; that the deceased went up to the front window, pulled the curtain back, one pane of the window being out, and looked through the window, and then stepped back; that he saw the defendant leaving the house by way of the back door; that the deceased then came around the southwest corner of the house, had taken a step or two, and that the defendant appeared at the southeast corner of the house, and had taken a step or two toward the deceased; that the defendant began cursing the deceased, and then shot him with a single-barrel shotgun; that the deceased then went toward the defendant, and defendant went around the house; that deceased then walked to the wagon and was driven home; that the deceased did not have a knife in his hand, and was not approaching defendant at the time he was shot.

The daughter also testified that the deceased, at the time he was shot, had his left hand upon his left breast,

with his right hand hanging to his side; that as soon as the defendant shot, the deceased dropped his left hand and put his right hand up to his breast.

One witness on the part of the defendant testified that there were some high weeds between the house and the place where the daughter of the deceased claimed to have seen the shooting, and that these weeds were thick and that it probably would have been impossible for a person standing where the daughter claimed to have been to see more than the top of the house.

Another witness for the defendant also testified that after the deceased was taken home, witness carried him from the wagon to the house, and saw a knife in the right hand pocket of the deceased's trousers, which knife was partly open.

The defendant testified on his own behalf that there were weeds higher that a man's head, which came within five or six feet of the house, and extended for about fifty yards in the direction of where the deceased's daughter claimed to have seen the shooting; that these weeds were green, and that a person could not see through them. He also stated that he went back to the house on the morning of the killing, taking with him his brother Henry and one of his little brothers-in-law; that they went to the house about nine or ten o'clock in the morning, driving a wagon for the purpose of moving the household goods; that after the wagon was loaded, his brother and brother-in-law left with the wagon, and that the defendant went back into the house and was packing the other things when he heard someone talking in the front yard; that he recognized the voices as being those of the deceased and his son Plato; that the deceased pulled back the curtain of the window and looked in; that he immediately stepped back from the

window and said, "The damn s. o. b. is in the house. We will go in and drag him out;" that the deceased was talking to his son Plato; that when the defendant heard that statement, he got his shotgun and went out the back door, because he thought deceased was coming in at the front door; that he listened to see where the deceased was after he stepped out the back door, and thought he heard the deceased coming around the north end of the house; that he, defendant, started around the south end of the house, and that when he got about the corner of the side room the deceased stepped around the southwest corner of the house with a knife in his hand; that the deceased was walking fast toward the defendant; that the knife the deceased had was open in his right hand, the blade pointing down; that the deceased's left hand was up in front of his breast; that deceased did not stop when he saw defendant, but kept coming at him, and thereupon the defendant shot; that he shot because he thought the deceased was going to hurt him; that he believed his life was in danger; that he only fired one shot; that deceased kept coming, and defendant did not know that he had hit the deceased; that defendant began running and deceased followed him; that defendant ran because deceased had gotten very close to him with the knife; that defendant retreated into the back yard to the fence, and deceased followed him as far as the back room, and then turned and went back; that defendant then went to the front end of the house and watched the deceased as he went back to the wagon; that the son of the deceased was not in sight at the time of the killing; that he shot deceased because deceased was coming on to him with a knife open in his right hand, and he was afraid of deceased, and had been for sometime on account of what he had heard about deceased being a dangerous

man; that he did not shoot as quick as he saw the deceased, because he thought the deceased would stop; that the deceased appeared to be mad at the time and his face was white. ·

*Anglin & Hall* and *J. L. Skinner,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is first contended that the court erred in overruling the defendant's motion for a continuance on account of the absence of one W. B. Baker, who, it is contended, was a material witness on the part of the defendant, in that the witness would testify that he was just over the fence from the scene of the difficulty at the time it occurred; that he saw Eaton come up to the defendant Brown's house, and look into the defendant's house through the window; that deceased turned with his knife in his hand and ran around to the south side of the house, and that after deceased had gone six or eight steps he was shot; that a few moments later deceased came back in sight of the window and went down to his wagon, which was one hundred yards from the house of the defendant; that' then the defendant came around to the north side of the house.

The record shows that the said Baker had been duly served with a subpœna, and that he was sick with pneumonia at the time of the trial. The defendant asked that the case be continued for the term, or until a later date in that term, so that the presence of this witness could be obtained in his behalf.

It appears from the affidavit in support of the motion for continuance that due diligence was used, in that the witness had been subpœnaed, and that it was through no

fault or connivance of the defendant that he was not present at the time the case was called for trial; but on the other hand the affidavit is not supported by the certificate of any physician who was attending the sick witness as to his then physical condition. There is no showing that he would be able to attend court at a later day in the term, or that his condition was such that he would likely recover, to be able to attend at the next term of court. Defendant did not ask that the witness be attached.

The facts set out in the affidavit that the witness would testify to as occurring within sight of the witness are practically uncontroverted, with the exception that the witness would testify that he saw a knife in the hands of the deceased. This, of course, was a material part of the testimony of the sick witness on behalf of the defendant, and would have tended strongly to corroborate defendant's testimony. But this court has repeatedly held that applications for a continuance on account of absent witnesses are addressed to the discretion of the trial court, and that the ruling of the trial court on such a matter will not be disturbed on appeal unless there appears to have been a manifest abuse of such discretion. In this case we cannot hold that the trial court abused its discretion in overruling this application for a continuance, in the absence of any showing whatsoever that such witness would likely have been able to attend court at a later day in said term or at the next term thereof, or by a reputable physician that his condition of health was such as to prevent his attendance at the trial. *Morehead v. State,* 12 Okla. Cr. 62, 151 Pac. 1183; *Stephens v. State,* 12 Okla. Cr. 90, 152 Pac. 138; *Petty v. State,* 11 Okla. Cr. 438, 147 Pac. 782.

It is our opinion, therefore, that no prejudicial error is shown in this respect.

It is also contended that certain remarks of the trial judge, both during the hearing of the testimony in the presence of the jury and later to the jury after the jury had reported an inability to agree upon a verdict, were seriously prejudicial to the substantial rights of the defendant.

In view of the disposition that is made of this appeal, it is unnecessary to pass upon these contentions further than to say that some of the remarks were unnecessary, even if not prejudicial, and it would have been much better had the court refrained from indulging in them. On the whole, however, we can see nothing in the action and conduct of the court that would authorize this court to reverse this judgment on this ground.

Among other assignments of error relied upon for a reversal of this judgment is the giving, over the objection and exception of the defendant, of certain instructions by the trial court. Instruction No. 21 is as follows:

"You are further instructed that the defendant in this case has taken the witness stand in his own behalf and has admitted that he shot and killed the deceased, J. B. Eaton, but claims as a defense that the shooting and killing was done in self-defense; and you are charged that the law of self-defense is, that if a person is at a place where he has a right to be and is assaulted in such a manner as to induce in him a reasonable belief that he is in danger of losing his life or receiving some great personal injury, he is justified in defending himself and using such force as it appears to him, under the circumstances, to be necessary to repel the attack, even to the taking of the life of his assailant; and in this case, if you believe from the evidence that the deceased went to the home of the defendant with an open knife, and by acts and demonstrations which caused the defendant to believe, and he did in fact believe, that he himself was in danger of death or receiving great

bodily harm at the hands of the deceased, and he shot the deceased in order to repel the attack and to keep the deceased from killing him, or inflicting upon his body great personal injury, then, in that event, the defendant would be justifiable in shooting the deceased, and you should find him not guilty."

This instruction is erroneous, in that it places too great a burden upon the defendant to establish the defense relied upon, to wit, self-defense.

Section 5902, Rev. Laws 1910, provides:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

Under the provisions of the foregoing section, it is incumbent upon the defendant, where the killing is admitted (as in this case), to prove circumstances that either mitigate, justify, or excuse it, unless, of course, the proof by the state only tends to show that the crime was manslaughter or that defendant was justifiable or excusable.

If the state's case only makes the crime manslaughter, then mitigating circumstances by the defendant are unnecessary, but he may then accept the burden of justifying or excusing the killing; but if the state's case proves murder, then the burden shifts to the defendant to either mitigate (that is, reduce to a lower degree of felonious homicide), justify, or excuse.

In the instant case, the proof on the part of the state would sustain a conviction of murder. The defendant made no attempt to mitigate the killing, but his defense

alone was justifiable homicide on the ground of self-defense. He then accepted the burden placed upon him by section 5902, *supra*. But the inquiry arises: How far does that burden extend? Is the defendant required to establish this affirmative defense beyond a reasonable doubt, or by the preponderance of the evidence? Evidently not, else the doctrine of reasonable doubt would become a nullity. He is only required to introduce such evidence as will raise in the minds of the jury a belief that he acted in his own necessary, or apparently necessary, defense, or will create a reasonable doubt thereof. In either case he should be acquitted.

The foregoing instruction No. 21 is the only instruction given by the court which attempts to apply the law of self-defense to the facts in the case. As far as it goes, it contains a correct statement of the law; but the court should have added, "or if the jury entertain a reasonable doubt of whether or not the defendant acted in his necessary, or apparently necessary, self-defense as herein instructed, they should acquit." With such an addendum, the instruction would have been impervious to attack. But it is contended by the state that the general instruction given that "the defendant is presumed to be innocent until his guilt is established beyond a reasonable doubt" cured any defect or omission in instruction No. 21; that the instructions must be considered as a whole, and when so considered, if they correctly embody the law of the case, no error prejudicial to the defendant has occurred. That doctrine has been approved by this court in numerous cases, and it is not our policy to depart therefrom as a general principle. But "self-defense" is an affirmative defense; the statute places a peculiar burden upon a defendant in a homicide case where he attempts to justify a killing, and

where the court by a separate instruction attempts to state the law of that defense as applied to the particular facts of the case, the burden required of the defendant should be properly safeguarded in the instruction itself. The jury is not required to believe such defense before an acquittal may follow; it is sufficient if such defense of itself raises a reasonable doubt of guilt, and in addition the jury may acquit if on the whole case a reasonable doubt of guilt exists. Such a doubt may arise from a consideration of all the evidence, and not necessarily from the defense interposed.

When instruction No. 21, *supra,* is considered in connection with instruction No. 19, which is as follows:

"The important questions for the jury to determine are: Was the defendant at the time he fired the fatal shot in present danger of death or serious bodily harm? Were the circumstances such as to afford him reasonable grounds for believing himself to be in such danger? Was the shooting done in good faith to protect himself from such danger or threatened danger?

"If these questions can be answered in the affirmative, the shooting would be justifiable. The defendant, under the law, would have the right to defend himself from the appearance of danger the same and to the same extent as he would were the danger real; and in passing upon the question as to the defendant's right to act, the matter must be viewed from the standpoint of the defendant"

—how can it be said that too great a burden was not placed upon the accused to establish "self-defense"? Through both instructions the court leads the jury to believe that the elements of self-defense must be "affirmatively" proven. The jury is told that the answers to the questions contained in instruction No. 19 must be in the affirmative before the defendant will be entitled to an acquittal. Such is not the law. If the defendant has raised

a reasonable doubt of whether or not he acted in self-defense, the jury must not convict; or, as heretofore stated, if on the whole case a reasonable doubt of guilt. exists, the jury must acquit.

Instruction No. 14, also given over the objection and exception of the defendant, is erroneous, in that it places the burden upon the defendant to "use no more force than necessary to protect his own life or from receiving serious bodily harm at the hands of the deceased."

Said instruction is as follows:

"You are further instructed that the defendant has interposed as a defense to the crime charged in the information what is known in law as self-defense; and in this connection you are instructed that to avail one of the right of self-defense, he must not be the aggressor, and if the defendant was in a place where he had a right to be, he may stand his ground if attacked by the deceased, and use all the force that reasonably appeared to him necessary to repel an attack or threatened attack, if any, by the deceased in order to protect his own life, or to keep from having inflicted upon his person serious bodily injury, and, if necessary, slay the deceased, provided he uses no more force than necessary to protect his own life, or from receiving serious bodily harm at the hands of the deceased."

The defendant is not required to measure with exactness the force necessary to repel a felonious assault. He may be acquitted if in the exercise of reasonable judgment there was an apparent necessity for using the amount of force employed by him. If the defendant exercises reasonable judgment and uses only such force as is apparently necessary to avert such danger (viewing the circumstances from defendant's standpoint at the time of the killing), he has complied with the requirements of the law.

The latter part of this instruction clearly robbed the previous statement "that defendant * * * may use all the force that reasonably appears to him necessary to repel the attack of deceased" of the meaning and effect it would have otherwise had, and tended to deprive the defendant of the right to exercise reasonable judgment under all the circumstances as they appeared to him at the time. Contradictory statements in the court's instructions, which are confusing and irreconcilable and one of which is erroneous, cannot be considered other than prejudicial. The appellate court cannot know whether the jury accepted and was bound by the correct statement in the instruction, or acted upon the incorrect statement.

We believe these instructions in the forms given were prejudicial to the substantial rights of this defendant, and tended to place too great a burden upon him under the law. The case is closely contested on the facts. The state's case would sustain a conviction of murder; but, on the other hand, if the defendant's theory is correct, he was entitled to an acquittal.

In view of the fact that the jury found the defendant guilty of manslaughter, can this court, under the circumstances of this case, say that the jury was not confused and misled by the contradictory and erroneous statements contained in the instructions? We believe not. It is apparent to our minds that the verdict reached must have been the result of confusion and misapprehension on the part of the jury as to the law of self-defense, and for this reason the judgment should be reversed and the cause remanded for a new trial.

DOYLE, P. J., and ARMSTRONG, J., concur.